## Ex Parte Corliss.

Opinion filed Oct. 23, 1907.

**Contempt — Right to Visit Grand Jury Room.**

1. Petitioner was adjudged guilty of contempt of court for wilfully violating an order excluding him from visiting the grand jury room while the grand jury were in session. He seeks to justify his action upon the grounds:

(1) That he was a duly appointed and qualified assistant state's attorney of the county.

(2) That he was employed by the board of county commissioners to assist the state's attorney in the discharge of certain duties; and

(3) That he was a duly appointed and qualified deputy enforcement commissioner of the state under the provisions of chapter 187, p. 303, of the Laws of 1907.

*Held*, for reasons stated in the opinion, that neither his appointment as assistant state's attorney nor his employment by the board of county commissioners vested in him any right to visit such grand jury sessions.

**Same — Constitutional Law — Enforcement — Commissioner.**

*Held*, also, that no such right could be claimed under his appointment as deputy enforcement commissioner for the reason that the law creating such alleged office is unconstitutional and void for the reasons set forth at length in the opinion.

Spalding, J., dissenting.

Guy C. H. Corliss was adjudged guilty of contempt of court for violating an order of the district court of Burleigh county, and was committed in default of payment of a fine imposed upon him. He petitions this court for a writ of habeas corpus, alleging that such order and commitment were unauthorized and void. Writ denied.

*Guy C. H. Corliss,* pro se, and *Asa T. Patterson,* for petitioner. *B. D. Townsend,* for respondent.

Fisk, J. Application for writ of habeas corpus. Petitioner alleges that he is deprived of his liberty through a commitment issued by the district court of Burleigh county pursuant to a judgment of that court adjudging him in contempt for violating an order excluding him from the grand jury room while a grand jury was in session. Petitioner admits that he willfully violated such order, but he challenges the validity of the same, claiming the right to enter such room for three reasons: (1) Because he claims to

be a duly appointed and qualified assistant state's attorney of Burleigh county: (2) because he claims to have a valid contract of employment with the board of county commissioners of said county to assist the state's attorney in the performance of his official duties; and (3) because he is a duly appointed and qualified deputy enforcement commissioner. It is stipulated that the merits may be disposed of upon the preliminary application for the writ.

Petitioner admits that prior to such official appointments and employment he had been employed by private individuals to prosecute certain criminal cases against one Edward G. Patterson for alleged violation of the law of this state prohibiting the manufacture and sale of intoxicating liquors, and that said official appointments and official employment were made for the purpose of investing him with legal authority in said criminal prosecutions, and to authorize him to attend before said grand jury in the interest of such private employers. Petitioner concedes that his appointment as assistant state's attorney was and is void for the reason that he is a nonresident of Burleigh county. His employment by the board of county commissioners was concededly for a nominal consideration. It was not a good-faith employment for the purpose of assisting the state's attorney in the discharge of his public duties, but was, as conceded by him, as above stated, for the purpose of gaining admission to the sessions of the grand jury for the purpose of discharging his duties under such private employment. Even if a good-faith employment by the county commissioners would legally qualify him to visit the grand jury session, which we seriously question, we are clear that he had no such right under the employment in question, as he concedes, as before stated, that it was merely to enable him to fulfill a contract of employment entered into with private individuals. Under such facts, it was manifestly improper for him to appear before such grand jury, and the district judge properly excluded him therefrom.

Petitioner's right to enter such room, therefore, necessarily depends upon his official character of deputy enforcement commissioner. The facts are not in dispute, but in opposition to the granting of the writ it is urged that the law creating the offices of enforcement commissioner and deputy enforcement commissioner, being chapter 187, page 303, of the Laws of 1907 of this state, is unconstitutional and void for several reasons, only one of which it is necessary for us to notice, as in our opinion the same is clearly

sound; and this is the fact that the statute in question violates those provisions of our state constitution by which the people reserved the right to have the public functions which are attempted to be conferred upon the officers created by said act discharged by officers of their own selection. In other words, the people in framing the constitution, were careful to safeguard this right in unmistakable language by providing, in effect, that certain public duties should be performed by persons elected by them; and among the public duties to be only thus performed are those pertaining to the offices of state's attorneys and sheriffs. We are not unmindful of the well-established rule that the courts should uphold legislative enactments unless they are clearly violative of some provision, either expressed or necessarily implied, of the organic law of the state. As stated by Mr. Cooley in his work on Constitutional Limitations, p. 218: "The question whether a law be void for its repugnancy to the constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

Keeping in mind this rule, let us examine the act in question. By section 1 the governor is authorized to appoint a capable citizen of this state to be enforcement commissioner, said enforcement commissioner to be paid a salary of $2,000 per annum, and his actual expenses, and to maintain an office at the capital. Section 2 requires that such appointee shall be an attorney at law, and he is authorized to exercise in any part of the state, with the advice and under the direction of the governor, all of the common-law and statutory powers of state's attorneys in their respective counties in the enforcement of the law against the manufacture and sale of intoxicating liquors. Section 3 provides for the appointment of one deputy commissioner whenever the commissioner may deem such deputy necessary. Such deputy shall have the same powers as are given to the enforcement commissioner. Section 4 pro-

vides that "the enforcement commissioner shall appoint such number of special enforcement sheriffs as in his judgment may be necessary, who shall have throughout the state all the common law and statutory powers of sheriffs in their respective counties in the enforcement of the law against the manufacture and sale of intoxicating liquors; * * * and they shall hold office during the pleasure of said enforcement commissioner." Section 5 provides for the giving of official bonds by these various officers. Section 6 provides that "it shall be the duty of said deputy commissioner and special sheriffs to exercise all the powers here conferred when, where and as directed by said enforcement commissioner." The remainder of the section relates merely to the payment of the expenses of these officers, and fixes the compensation of the deputy commissioner and special sheriffs. Section 7 provides for the taxation of costs for such enforcement commissioner and deputy commissioner in all actions in which they appear, which costs shall be the same as are allowed to be taxed for state's attorneys under the prohibition law of this state, and also for the taxation of costs for special sheriffs, which shall be the same as are taxed for sheriffs in such cases. Section 8 is as follows: "The said enforcement commissioner, upon being satisfied that the local authorities fail to enforce the law against the manufacture and sale of intoxicating liquors in any county, city, village or town of this state, shall, subject to the limitation of section 2 hereof, with the aid, assistance and co-operation of the said deputy commissioner and one or more of such special sheriffs, enforce said laws." The remaining sections of the law are not material to a decision of the questions here involved.

We think it clear, from the language employed, that it was the intention of the legislative assembly, in the enactment of this law, to vest in the enforcement commissioner the power, whenever he deems the exercise thereof necessary, to displace the regularly elected state's attorney and sheriff in any county, so far as the enforcement of the so-called "Prohibition Law" is concerned in such county, and appoint in their stead a deputy enforcement commissioner and a special enforcement sheriff to discharge the duties of such regularly elected officers during the pleasure of the enforcement commissioner.

Has the legislative assembly, under the constitution of this state, the power to do this? In disposing of this important question

we cannot be controlled by the desirability or seeming necessity for such a law or by the beneficial results which might be obtained thereunder. It is far more important that the integrity of the constitution should be maintained unimpaired than that any law, however desirable, which conflicts therewith, should be upheld. Whether the present laws are adequate, or whether some other remedy for the evil sought to be reached by the act in question may be lawfully provided by the legislative department of the state, is not material to this inquiry. We are to pass upon the law in question in the light of the constitution, and if it can be sustained as a constitutional exercise of the legislative power delegated by the people in their sovereign capacity to the legislative assembly, it is our solemn duty to sustain it; but if, in our judgment, the act is clearly violative of the constitution, we should not hesitate to perform the duty of pronouncing the same unconstitutional and void.

We take it to be a self-evident proposition that if the legislative assembly had the power to pass the act in question, then they had the power to go further and provide that such special enforcement officers should have the right to permanently displace the said county officers. Not only this, but they had the power to go still further and provide for the appointment of special officers by the central authority to perform all duties pertaining to the enforcement of all criminal laws in lieu of the regularly elected county officers provided for in the constitution, and thus frustrate to this extent the evident purpose of the framers of the constitution in providing for the election by the people in each county of officers for the performance of such public functions. By the express provisions of the act in question the enforcement commissioner, a mere appointee of the governor, may, whenever in his judgment he thinks it necessary or advisable, appoint any number of so-called "enforcement sheriffs" in any county in the state without consulting the wishes of the citizens of such county, and even against their will, and such appointed officials are clothed with all the powers and duties (in the enforcement of the prohibition law) possessed by the sheriff whom the people have, by the exercise of their sovereign right, expressly declared shall be elected by them. The same is true with reference to state's attorneys and the performance of their duties. If the legislative assembly has the power to do this, why has it not the power to provide for the appoint-

ment of a special enforcement governor, or a special enforcement attorney general, or a special enforcement court? The governor, attorney general and the judges are no more constitutional officers than are state's attorneys and sheriffs. It seems too obvious for discussion that the framers of the constitution, in providing for the election of these officers by the people, thereby reserved unto themselves the right to have the inherent functions theretofore pertaining to said offices discharged only by persons elected as therein provided. The naming of these officers amounted to an implied restriction upon legislative authority to create other and appointive officers, for the discharge of such functions. If this is not true, then of what avail are the provisions of the constitution above referred to? If these constitutional offices can be stripped of a portion of the inherent functions thereof, they can be stripped of all such functions, and the same can be vested in newly created appointive officers, and the will of the framers of the constitution thereby thwarted. The fact that these appointive officers might or would discharge the duties better than the officers provided for in the constitution is not material. If these latter officers fail to discharge their duties, and it is desirable to provide for other officers to perform such duties, the remedy is with the people. They may amend the constitution, or, through the power delegated to the legislative assembly, provide for their removal from office as has been done. Under the act in question the enforcement commissioner is vested with the power of determining whether the state's attorney and sheriff of any county are discharging their duties with reference to the enforcement of the prohibition law. This is a broad discretion, and may be exercised in the interest of strict enforcement of the law or otherwise, and, therefore, what guaranty is there that such appointive officers would enforce the law as well as the officers elected by the people? But this is a matter which perhaps pertains more properly to the wisdom of such an enactment rather than to the question of its constitutionality; but the point we desire to make is that the framers of the constitution evidently considered it more conducive to the public welfare to have the functions of these offices performed by officials elected by the people of the respective counties than to intrust them to officers otherwise chosen.

Section 173 of our constitution is relied upon as upholding this statute. This section, after enumerating the county officers and

prescribing that they shall be elected by the electors of the county, further provides that their duties shall be prescribed by law; and it is argued that under the power to prescribe such duties the legislative assembly may take them away, or a portion thereof, and confer them upon other officers not elected by the people, just as is attempted to be done by the act in question. Such argument, carried to its logical and inevitable result, would lead to the monstrous doctrine that the constitution means nothing, and, notwithstanding its plain provisions, the legislative assembly may provide that the duties pertaining to all these offices shall be discharged by officers appointed in some manner prescribed by them. The act in question does not purport to prescribe the duties of these constitutional officers, but it attempts to vest in other persons not elected the power to perform such duties, and to this extent supplant these constitutional officers. Such legislation, in our opinion, cannot be sustained. It strikes a blow at . the very foundation principles of our form of government. During the early history of this state, Chief Justice Corliss, in State ex rel. Faussett v. Harris, 1 N. D. 194; 45 N. W. 1102, recognized the distinction in this respect between constitutional offices and those created by the legislative assembly. Speaking of the latter kind of office he says: "The office is not imbedded in the constitution, as is the case with respect to the offices named in section 173 of the constitution. These are constitutional offices. The other offices, including that of county assessor, are offices which, under the express provisions of section 173, the legislature may abolish by creating other offices to take their place." In that case the court had under consideration the power of the legislature to abolish the old office of county assessor and to confer the duties upon district assessors, and the court held that, as the office was of legislative creation and therefore not "imbedded in the constitution," the act in question was valid.

If the offices mentioned in section 173, which includes those of state's attorney and sheriff, "are imbedded in the constitution," it inevitably follows that they cannot be stripped by the legislature of the important duties inherently connected therewith, for if this can be done, then these offices were "imbedded in the constitution" for no purpose. We do not deny the power of the legislature to prescribe duties for these officers, which power carries with it by implication the right to change such duties from time to time

as the public welfare may demand; but we deny its power to strip such offices, even temporarily, of a portion of their inherent functions and transfer them to officers appointed by central authority. This, as we view it, is a plain violation of the constitution, and is subversive of the obvious intent of its framers to reserve to the people of each county the right, through their elected officials, to enforce the criminal laws of the state, as well as to perform other functions of government by them so long performed and so well understood. It is apparent that the framers of the constitution, by section 173 and other sections embodied in that instrument, intended to carry out a scheme of government by which the political subdivisions of the state known as "counties," should be given the right of local self-government, which should apply not only to local affairs of government, but also to confer upon the people of each county certain governmental function in which the people of the entire state are also interested. We do not mean by this that the people of each county had delegated to them these functions unrestricted by proper legislative regulations, for, as we said before, it is competent for the legislative assembly to provide by law for removals in case of malfeasance or misfeasance in office, and to provide a method of filling such vacancies. But it is an entirely different proposition to say that the legislative assembly may go further and create a new office to be filled by central authority, and transfer to such appointive officer the duties essentially and constitutionally belonging to the county office.

In the argument of this case counsel called to our attention a great many cases dealing with the question of home rule or local self-government. There is much conflict of views among the courts upon this question, some holding that this right of local self-government does not extend to functions of government in which the people of the entire state are interested, while others hold to the contrary view. Most of the cases deal with the question as applied to municipalities, and not to counties or other political subdivisions of the state. Upon an analysis of the cases it will be found that most of the decisions turn upon the question as to whether the implied right of local self-government is guaranteed to municipalities under the constitution. It must not be overlooked that there is a wide distinction in this respect between counties and municipalities, the former, by express provisions of the constitution, having been made political subdivisions of the state, while cities and other

municipalities, so far as this state and most other states are concerned, are mere creatures of the legislative department, and, being such, are, of course, in all respect subject to legislative regulation and control. As to county organizations see constitution, article 10.

On account of the importance of the question here involved we deem it proper to review some of the leading decisions relating to the right of local self-government. In the following cases it has been held that towns and cities are entirely subject to legislative control in the absence of a constitutional provision to the contrary: People v. Draper, 15 N. Y. 532; Mayor, etc., v. State, 15 Md. 376, 74 Am. Dec. 572; State v. County Court, 34 Mo. 546; Booth v. Town of Woodbury, 32 Conn. 118; Webster v. Town of Harwinton, 32 Conn. 131; People v. Mahaney, 13 Mich. 481; People v. Shepard, 36 N. Y. 285; Town v. Jenkins, 57 N. Y. 177; Barnes v. Dist. of Columbia, 91 U. S. 540, 23 L. Ed. 440; State v. Covington, 29 Ohio St. 102; Pumphrey v. Mayor, etc., 47 Md. 145, 28 Am. Rep. 446; Burch v. Hardwicke, 30 Grat. (Va.) 24, 32 Am. Rep. 640; Perkins v. Slack, 86 Pa. 270; Meriwether v. Garrett, 102 U. S. 472, 26 L. Ed. 197; Coyle v. McIntire, 7 Houst. (Del.) 44, 30 Atl. 728, 40 Am. St. Rep. 109; State v. Smith, 44 Ohio St. 348, 7 N. E. 447, 12 N. E. 829; State v. Hunter, 38 Kan. 578, 17 Pac. 177; Com. v. Plaisted, 148 Mass. 386, 19 N. E. 224, 2 L. R. A. 142, 12 Am. St. Rep. 566; Trimble v. People, 19 Colo. 187, 34 Pac. 981, 41 Am. St. Rep. 236; State v. Williams, 68 Conn. 131, 35 Atl. 24, 421, 48 L. R. A. 465. On the other hand, the following authorities, among others, lay down the proposition that although the constitution is silent upon the subject, the legislature cannot in any way interfere with certain powers of municipalities. In other words, they recognize the implied right of local self-government as applied to cities and towns. People v. Hurlbut, 24 Mich. 44, 9 Am. Rep. 103; People v. Albertson, 55 N. Y. 50; People v. The Common Council of Detroit, 28 Mich. 228, 15 Am. Rep. 202; Park Com'rs v. Mayor, etc., 29 Mich. 343; People v. Lynch, 51 Cal. 15, 21 Am. Rep. 677; Allor v. Wayne County, 43 Mich. 76, 4 N. W. 492; People v. Porter, 90 N. Y. 68; Robertson v. Baxter, 57 Mich. 127, 23 N. W. 711; Atty. Gen. v. Detroit, 58 Mich. 213, 24 N. W. 887; Wilcox v. Paddock, 65 Mich. 23, 31 N. W. 609; State v. Denny, 118 Ind. 382; City of Evansville v. State, 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93; Board of Metropolitan Police v. Board

of Auditors, 68 Mich. 576, 36 N. W. 743; Rathbone v. Wirth, 150 N. Y. 459, 45 N. E. 15, 34 L. R. A. 408; Matter of Brenner, 170 N. Y. 185, 63 N. E. 133; People v. Tax Com'rs, 174 N. Y. 417, 67 N. E. 69. Other authorities might be cited, but the above are sufficient to show how hopelessly in conflict are the adjudications upon this question.

The question of the implied right of local self-government as to municipalities necessitates a construction of the constitution and the extent of powers conferred by said instrument upon the legislative department of the state. In Cooley's great work on Constitutional Limitations (6th Ed.) 49, it is said that a constitution "grants no right to the people, but is the creature of their power, the instrument of their convenience. * * * A written constitution is, in every instance, a limitation upon the powers of government in the hands of agents."

In State v. Denny, supra, it was said: "At the adoption of the state constitution all power was vested in the people of the state The people still retain all power, except such as they expressly delegated to the several departments of the state government by the adoption of the constitution. In the first section and first article of the constitution it is declared that "all power is inherent in the people." It is contended by counsel that, as certain rights were granted and certain other rights reserved by the people, therefore all rights were granted, except such as were expressly reserved. The peculiarity of the theory is that while the people, by the constitution, made grants of power to three different departments of government, it is contended that all power that was at that time in the grantor, the people, passed to one branch of the government, viz., the political or legislative branch, and that it took all power not mentioned in the instrument, and the executive and judiciary took only such as was expressly granted to them, and the people retained such only as was specifically named and reserved. It is certainly a novel method of construction, and contrary to all rules for construing contracts, deeds, wills and other instruments, and it seems to us that the proposition need but to be stated to prove its fallacy. In construing and giving an interpretation to the constitution, we must take into consideration the situation as it existed at the time of its adoption, the fact expressed in the instrument that all power is inherent in the people, the rights and powers vested in and then exercised by the people, the existence of cities

and towns and the right of local self-government exercised by them, and the laws in force and form of government existing at the time of its adoption."

Mr. Cooley, in speaking of the extent of powers delegated by the people to the legislature, says: "They must be understood to grant the whole legislative power which they possessed, except so far as, at the same time, they saw fit to impose restrictions. While, therefore, the Parliament of Britain possesses completely the absolute and uncontrolled power of legislation, the legislative bodies of the American states possess the same power, except, first, as it may have been limited by the constitution of the United States, and, second, as it may have been limited by the constitution of the state." Cooley's Const. Lim. (6th Ed.) 205.

In People v. Draper, supra, Chief Justice Denia stated the rule thus: "The people, in framing the constitution, committed to the legislature the whole lawmaking power of the state which they did not expressly or impliedly withhold. * * * The constitution was not framed for a people entering into a political society for the first time, but for a community already organized, and furnished with political and legal institutions adapted to all or nearly all the purposes of civil government; and that it was not intended to abolish these institutions, except so far as they were repugnant to the constitution then framed."

Again, in People v. Hurlbut, supra, that eminent author and jurist, Judge Cooley, in writing the opinion, said: "If this charter of state government which we call a constitution were all there was of constitutional command; if the usages, the customs, the maxims, that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood and mutual responsibility in neighborhood interests; the precepts that have come from the revolutions which overturned tyrannies; the sentiments· of manly independence and self-control which impelled our ancestors to summon the local community to redress local evils, instead of relying on king or legislature at a distance to do so—if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain, but the living spirit— that which gives it force and attraction, which makes it valuable, and draws to it the affections of the people, that which distinguishes it from the numberless constitutions, so called, which in Europe have been set up and thrown down within the last hun-

dred years, many of which, in their expressions, have seemed equally fair, and to possess equal promise with ours, and have only been wanting in the support and vitality which these alone can give—this living and breathing spirit, which supplies the interpretaton of the words of the written charter, would be utterly lost and gone."

It is thus apparent that, in construing a constitution, the same must be construed in the light of contemporaneous history—of conditions existing at and prior to its adoption. By no other mode of construction can the intent of its framers be determined and their purpose given force and effect. In other words, the spirit, as well as the letter of the instrument, bust be given effect. It was the unwritten and necessarily implied provisions of the constitution with which the courts were dealing in the foregoing cited cases, in which the implied right of local self-government for municipalities was affirmed on the one hand and denied on the other. If the constitution had expressly created these municipalities and provided for the election of their officers by the people, as our constitution does as to counties and their officers, then we apprehend that these cases would not have arisen. We do not claim that the act in question is unconstitutional because it violates any implied constitutional restriction of legislative power to interfere with the right of local self-government, but we do assert that the people, in framing the constitution and in providing for the election of those officers, thereby expressly vested in such officers, and intended to vest in them, the function of administering the criminal laws of the state as theretofore administered by such officers; that when a method of administration of laws is provided for by the constitution, the legislative assembly cannot provide a different method. They cannot transfer the duties. of any such officers to a new office created by them. The constitutional method of local administration of .laws cannot be changed by the legislative assembly simply because they are of the opinion that the local officers wil not honestly administer such duties. In other words, in adopting the constitution the people decided that these local officers will administer the law better than any one else, and the legislative department is powerless to impeach their judgment.

A very able and exhaustive article upon the subject of "The Right to Local Self-Government" is contained in volumes 13 and 14

of the Harvard Law Review. The author of this article, Mr. Eaton, has the following to say regarding some of the leading cases upon this subject: "The People v. Draper, 15 N. Y. 532. In this case it was held that the reservation contained in section 2, article 10, of the constitution of New York of 1846, to the electors or local authorities of the right to elect or appoint county, city, town and village officers, relates only to such offices as existed when the constitution went into effect, and therefore that the legislature may create new civil divisions of the state embracing two or more existing counties, cities, towns or villages, providing the old civil divisions be not abolished. Consequently the act to establish a Metropolitan Police District, consisting of the counties of New York, Kings, Richmond and Westchester, was upheld as constitutional. * * * The pre-existing system of police was abolished, together with the control over the police by the former authorities of the towns, cities, etc., of the new district." He refers to the dissenting opinion of Brown, J., with the statement that "the whole dissenting opinion should be carefully read, especially as his conclusions have been adopted since then, as we shall see, by the New York Court of Appeals." This able article then continues: "The plain statement of the facts connected with this case by Prof. Goodnow (page 20) in his Municipal Home Rule, shows that the historical antecedents of New York are such as to warrant the conclusion that the case was wrongly decided." He then quotes from Prof. Goodnow as follows: " 'The City of New York received from the English kings during the colonial period a charter, which, on the declaration of independence of the colony of New York and the establishment of the new state of New York was confirmed by the first constitution of the state. Article 36. For a considerable period after the adoption of this constitution, changes in that charter were made upon the initiation of the people of the city, which initiation took place through the medium of charter conventions whose members were elected by the people of the city, and no statute which was passed by the legislature of the state, relative to the affairs of the city of New York, took effect within the city until it had been approved by the city. About the middle of the century, the legislature was called upon to interfere in the administration by the city of certain matters which affected the state as a whole. One of the most marked examples of this central interference, made without the consent or approval

of the city or its people, is to be found in the adoption of the metropolitan police bill in 1857. The administration of the police in the period immediately preceding 1857 had been accompanied by great scandal and was regarded as extremely inefficient. Partly because of this, and partly, it is believed, for reasons of partisan politics, the legislature provided for the formation of a metropolitan police district which embraced all the territory of certain outlying districts. On account of the unprecedented character of such an act, the people of New York, led by the mayor, attempted to resist the enforcement of the bill, and such resistance led to positive bloodshed. The question, however, was finally referred to the courts, and the Court of Appeals (People v. Draper, 15 N. Y. 532) held that the action of the legislature was perfectly proper, inasmuch as the administration of the police was not a local function, but was a matter which affected the state as a whole, and might therefore be put into the hands of authorities having jurisdiction over a territory greater than that of any one city, and appointed by the central government of the state. The success of the legislature in thus interfering in what had been considered by the people of New York a branch of municipal administration led it to carry its interference into other branches where its action could not be so well justified. * * * The application of the principle thus established has been of great disadvantage to the government of the various cities within the state, and, as has been pointed out by the Hon. Seth Low in his chapter on Municipal Government, in Bryce's American Commonwealth (1st Am. Ed.) vol. 1, p. 639, the habit of interference in city action has become to the legislature almost a second nature.'" Continuing, Mr. Eaton says: "The case of People v. Drayer was followed by People v. Shepard, 36 N. Y. 285, which involved the constitutionality of an act establishing a capital police district, embracing parts of Albany and Rensselaer counties, the city of Schenectady, and the lines of railroad between Albany and Schenectady. Emboldened by success, the politicians next sought to extend the field of their peculiar operations by passing an act 'To establish the Rensselaer police district,' to consist of the city of Troy and a contiguous strip, the principle supposed to have been established in People v. Draper being relied upon as giving color to this act. People v. Albertson, 55 N. Y. 50. The satirical statement in the opinion, last paragraph, page 67 of 55 N. Y., shows that the court well understood the nature of the

forces securing such legislation; 'as the Capital Police District was an experiment, and, as it resulted, a successful experiment, upon the principle supposed to be established in People v. Draper, the act before us is an experiment, and in the direction of an encroachment upon the constitution, an improvement upon both acts, and marks the progressive spirit of the day.' Cooley also well understood the nature of these forces—'a remarkable case of evasion to avoid the purpose of the constitution, and still keep within its terms, was considered in People v. Albertson, 55 N. Y. 50.' (Cooley, Const. Lim. 207, note 1.) The case of People v. Draper is criticised, distinguished and regretted at pages 63, 64, 65 of 55 N. Y., of People v. Albertson; and the case of People v. Shepard is questioned at pp. 65, 66, 67 of 55 N. Y., with strong approval given to Brown, J.'s, dissenting opinion in People v. Shepard, at page 64 of 55 N. Y.: 'That decision has now stood so long judicially uncondemned, although never, I think, satisfactory to the public or the legal profession, that it might not be proper, under any circumstances, to review or overrule it; and it is to be hoped, in the interests of constitutional government by the people, that the occasion to reaffirm its doctrines may never arise. To my mind, the dissenting opinion of Judge Brown, concurred in by Judge Comstock, presents unanswerable arguments why the decision should have been different.' That the cases of People v. Draper and People v. Shepard are considered as overruled at the present time in New York, sufficiently appears in Rathbone v. Wirth, 6 App. Div. 277, at page 295, 40 N. Y. Supp. 535, at pages 545 and 546: 'But neither the Draper nor Shepard Case, I think, can any longer be considered authority in this state, since the decision of the case of People v. Albertson, 55 N. Y. 50.' Upon appeal to the Court of Appeals the judgment in the Supreme Court was affirmed. Rathbone v. Wirth, 150 N. Y. 459, 45 N. E. 15, 34 L. R. A. 408. The opinion given in both courts all deserve careful study. The result is that the doctrine laid down in People v. Draper has been successfully shaken, and is no longer the law in New York. It is no longer an authority. It may be claimed that this is largely in consequence of section 2, article 10, of the constitution of New York, 1846, re-enacted in the constitution adopted November 6, 1894, and in force January 1, 1895. But it is submitted that this section is merely declaratory of what the law would be as to the powers of cities, towns and villages to elect their own

officers, even without this statement in the constitution, and therefore has no bearing on the matter at issue."

We have quoted thus at length from this able article because its clear and forcible logic carries conviction to our minds of its absolute soundness. As late as 1903 the Court of Appeals of New York, in the case of People ex rel. Met. St. Ry. Co. v. Tax Com'rs, 174 N. Y. 417, 67 N. E. 69, 63 L. R. A. 884, 105 Am. St. Rep. 674, had under consideration the validity of a statute taxing for the first time in the history of that state special franchises, and providing for a state board of tax commissioners appointed by the governor. It was urged that the act in question violated the home-rule provisions of the constitution, for the reason that it deprived the local taxing officers of the functions of taxation. The validity of the act was upheld, but the decision was placed upon the ground that the function of assessing a special franchise did not, in its nature, belong to a county, city, town or village, as such function had never been execised by such local officers, but that the function belonged to the state, by which it was exercised for the first time. The court said: "It did not come within the experience of former times, and was not contemplated by the framers of the constitution." The opinion was written by Judge Vann, and concurred in by all the other justices, and the same contains a very able and exhaustive treatment of the doctrine of local self-government, reviewing all the prior decisions of that court upon the subject. After reviewing the history in that state, and after referring to the provisions of the constitution of New York similar to section 173 of our constitution, the opinion reads: "These and other commands of the different constitutions, when read in the light of prior and contemporaneous history, show that the object of the people in enacting them was to prevent centralization of power in the state, and to continue, preserve and expand local self-government. This was effected through a judicious distribution of the power of selecting public officers, by assigning the choice of local officers to the people of the local divisions, and to the people generally, those belonging to the state at large. * * * The principle of home rule is preserved by continuing the right of these divisions to select their local officers, with the general functions which have always belonged to the office. Unless the office, by whatever name it is known, is protected, as the courts have uniformly held, the right to choose the officer would be lost, for with his former

functions gone he would not be the officer contemplated by the constitution, even if the name were retained. Unless the office or officer is mentioned eo nomine in the constitution, the same may be changed, or the office abolished, provided the functions, if retained at all, remain in some officer chosen by the locality. Local functions, however, cannot be transferred to a state officer. The legislature has the power to regulate, increase or diminish the duties of the local officer, but it has been steadfastly held that this power is subject to the limitation that no· essential or exclusive function belonging to the office can be transferred to an officer appointed by central authority. The office may go, but the function must be exercised locally, if exercised at all. While no arbitrary line is drawn to separate the powers of local and state officers, the integrity of the local office is protected, with its original and inherent function unimpaired. It is interference, whether direct or indirect, with the vital, intrinsic and inseparable functions of the office as thus defined and understood that the constitution prohibits."

In State v. Hastings, 11 Wis. 448, the court held unconstitutional an act passed by the legislature providing for the appointment and prescribing the duties of a state comptroller, upon the ground that the function of auditing accounts was, by the constitution, vested in the secretary of state, who was made ex offiio auditor by the constitution. The act in question did not purport to supplant the secretary of state in the performance of this function of auditing accounts, but it made it the duty of this newly created officer to audit the same after the secretary of state as such ex officio auditor had done so. The court said: "The act, taken all together, looks like a studied effort to attain indirectly what it was evident to the framers could not be accomplished directly. The result is that we have two auditors instead of one, both of whom must act in succession, before any business can be transacted. The question arises whether, under the foregoing provision of the constitution, the legislature have the power to create a second auditor or officer authorized to perform the same duties, whose concurrence is necessary before the acts of the constitutional auditor shall take effect. We think they have not, and that the functions of that officer cannot, in whole or in part, be transferred to, or be exercised concurrently or otherwise by, any other person or officer. It falls directly within the rule that the express mention of one thing implies the exclusion of another. Expressio unius est exclusio

alterius. This rule applies as forcibly to the construction of written constitutions as other instruments. * * * A constitution being the paramount law of the state, designed to separate the powers of government and to define their extent and limit their exercise by the several departments, as well as to secure and protect private rights, no other instrument is of equal significance. It has been very properly defined to be a legislative act of the people themselves in their sovereign capacity; and, when the people have declared by it that certain powers shall be possessed and duties performed by a particular officer or department, their exercise and discharge by any other officer or department are forbidden by a necessary and unavoidable implication. Every positive delegation of power to one officer or department implies a negation of its exercise by any other officer, department or person. If it did not, the whole constitutional fabric might be undermined and destroyed. This result could be as effectually accomplished by the creation of new officers and departments exercising the same power and jurisdiction as by the direct and formal abrogation of those now existing. And, although the exercise of this power by the legislature is nowhere expressly prohibited, nevertheless they cannot do so. The people having in their sovereign capacity exerted the power and determined who shall be their auditor, there is nothing left for the legislature to act upon." The court, after referring to certain New York decisions as sustaining the above rule, further says: "This rule of construction extends to every part of the instrument, and, if a violation of it is allowed in the case of the auditor, it is difficult to see why it should not be in the case of any other officer or department. Thus, the legislature might with equal propriety create new courts of justice, usurping and exercising the same power and jurisdiction as those established by the people, and a new executive, to correct the mistakes and control the action of the one chosen by them. It seems to us clear that the legislature could do neither, and that so much of the act under consideration as attempts to transfer to the so-called "Comptroller" the functions of auditor, and to clothe him with authority to control or reverse the acts of that officer, is unconstitutional and void."

The foregoing opinion fully sustains what we have heretofore said to the effect that, the constitution having named certain officers, the functions essentially and inherently connnected with such of-

fices must be discharged by these constitutional officers and none others. It will be noticed that the duties to be performed by the secretary of state as ex-officio auditor were not prescribed by the constitution any more than the duties of state's attorneys and sheriffs are prescribed in our constitution, but it was held by the Wisconsin court that by the naming of these officers in the constitution the framers thereof intended that the public functions appertaining to such offices must be performed by such constitutional officers.

In State v. Brunst, 26 Wis. 412, 7 Am. Rep. 84, the Supreme Court of that state was again called upon to pass upon a similar question. By an act of the legislature of that state passed in 1870, it was declared that the building known as the "House of Correction" of the county of Milwaukee, should constitute the county jail of the county, and making the inspector thereof ex officio the jailer of the county, giving him the exclusive charge and custody of such jail and of the prisoners therein, and making it the duty of the sheriff to deliver· to said inspector on demand all prisoners in the old jail, etc. A writ of mandamus was applied for to compel the sheriff to comply with this statute, and he resisted the application for the writ upon the ground that the act was unconstitutional, contending that the legislature could not take from his office his public function and transfer the same to the relator. He insisted that by virtue of his office of sheriff, and as a part and parcel of the duties from time immemorial belonging to his office by law, he, as such sheriff, was entitled to the custody of the jail and the prisoners therein, and that it was no more competent for the legislature to deprive him of such duties and transfer them to another officer than to deprive him of the right to execute writs and processes or the duty of conserving the public peace. We quote from the opinion of the court. "It seems to us that this view of the question is rational, and in harmony with the spirit of the constitution. The office of sheriff, in a certain sense, is a constitutional office; that is, the constitution provides that sheriffs shall be chosen by the electors of the respective counties. * * * Now, it is quite true that the constitution nowhere defines what powers, rights and duties shall attach or belong to the office of sheriff. But there can be no doubt that the framers of the constitution had reference to the office with those generally recognized legal duties and functions belonging to it in this coun-

try; and in the territory, when the constitution was adopted. Among those duties, one of the most characteristic and well acknowledged was the custody of the common jail and of the prisoners therein. This is apparent from the statutes and authorities cited by the counsel for the respondent. And it seems to us unreasonable to hold, under a constitution which carefully provides for the election of sheriffs, fixes the terms of the office, etc., that the legislature may detach from the office its duties and functions, and transfer those duties to another officer. * *. * If the legislature can do .this, why may it not deprive the sheriff of all the duties and powers appertaining to his office, and transfer them to some officer not chosen by the electors? It would certainly be a very idle provision of the.constitution to secure to the electors the right to choose their sheriffs and at the same time leave to the legislature the power to detach from the office of sheriff all the duties and functions by law belonging to that office when the constitution was adopted, and commit those duties to some officer not elected by the people. For this would be to secure to the electors the right to choose a sheriff in name merely, while all the duties and substance of the office might be exercised by and belong to an officer appointed by some other authority."

The court in its opinion in the foregoing case, refers to State v. Dews, R. M. Charit. (Ga.) 397, which was decided early in the history of that state, as holding to a contrary view, but cites, as sustaining its opinion, Warner v. People, 2 Denio (N. Y.) 272, 43 Am. Dec. 740; State v. Hastings, 10 Wis. 525, and McCabe v. Mazzuchelli, 13 Wis. 478. The case from Georgia was urged before us upon the argument of the cast at bar as announcing the correct rule. This case was decided in 1835 by the superior court of the Eastern district of Georgia, and in so far as the points actually raised and determined in that case were concerned was perhaps correctly decided, but we consider it of but very little, if any, weight as an authority upon the question here involved and expressly decided by the Wisconsin court.

In O'Connor v. City of Fond du Lac, 109 Wis. 253, 85 N. W. 327, 53 L. R. A. 831, the Supreme Court of Wisconsin had under consideration the home rule provision of their constitution, which is identically the same as that of New York, and the court cites and approves the construction adopted by the later New York decisions. Speaking of the constitutional provision aforesaid, the court ob-

served: "The purpose of that is plain, and has often been de-
clared by the courts. It was to render secure the important right
of local self-government—to give to the people of each locality
the power to say and determine as directly as possible who shall
perform the governmental functions that concern such localities
only as organized subdivisions of the state. That right, under our
system of government, has from the start been regarded as the very
foundation thereof, and absolutely necessary to its success."

In the late case of State v. Anson (Wis.) 112 N. W. 475, the
question of the constitutional limitation on legislative interference
with local self-government for counties and municipalities is quite
fully considered, and the prior adjudications of that court, as·
well as the courts of other states, are cited. The constitutional pro-
vision in question is as follows: "All county officers whose elec-
tion or appointment is not provided for by this constitution shall
be elected by the electors of the respective counties, or appointed
by the boards of supervisors or other county authorities, as the
legislature shall direct. * * * All officers whose offices may
hereafter be created by law shall be elected by the people or ap-
pointed as the legislature may direct." The legislature of that state
created the office of jury commissioners, and provided for the ap-
pointment of such commissioners by the circuit courts or judges
of the state. The functions of these newly created officers were
theretofore imposed upon certain county officers, who also had
various other duties, the duties pertaining to the drawing of jurors
being merely incidental. It was urged that this law violated the
foregoing constitutional provision, but the court sustained the valid-
ity of the law; the decision, however, being placed upon the ground
that at the time of the adoption of the constitution there were no
officers known as "jury commissioners," either as county officers
or otherwise. It is apparent that the decision would have been
to the contrary had there existed, prior to and at the time of the
adoption of the constitution, county officers charged with the per-
formance of these functions. The court said: "It is not contended
that at the time of the adoption of the constitution any officers
known as 'jury commissioners' existed in this state, either as county
officers or otherwise; but it is contended that the selection of
names to go upon the jury list for the circuit courts of the state
was at that time imposed upon certain county officers, who also
had various other duties, and that the creation of an officer to exer-

cise that function is but an evasion of the constitutional restriction."
After stating that the section of their constitution above quoted
was taken substantially verbatim from the constitution of 1846
of New York, the opinion continues: "It had received no author-
itative construction by the ultimate court of that state prior to its
adoption here in 1848; but before serious questions arose in this
state upon it, it did receive exhaustive discussion and construction
in an opinion by Denio, J., in People ex rel. Wood v. Draper, 15
N. Y. 533, both the reasoning and decision in which were almost
at once accepted and approved by this court. (Citing the Wis-
consin authorities.) The general propositions declared in that
case, and so accepted and approved, were that the purpose of this
section of the constitution was to protect in a general way the
policy of local self-government in cities and counties, to the extent
at least that such officers as exercised the functions of such local
government at the time of the adoption of the constitution should
continue to be chosen by the locality, and from this was deduced
the view that 'all other county officers' in the first sentence of the
above quotation meant those existing at the time the constitution
was adopted, and that, while the constitution in express terms per-
mitted other methods of selection of incumbents of offices there-
after to be created, it could refer in that regard only to offices and
officers different in kind from any formerly existing, otherwise the
effect of the last clause would be to nullify the former by the mere
creation of offices new in name, but in all practical effect mere
perpetuates of the old ones. Hence was declared a limitation
of the meaning of the words 'offices which may hereafter be
created by law' to such as were not mere substitutes or equivalents
for pre-existing offices. * * * In State ex rel. Williams v.
Samuelson (Wis.) 111 N. W., at page 716, the offices permitted to
be created by the legislature were described as those the duties
of which 'are not such as were incident to some county office at the
time of the formation of the constitution.' State v. Hastings,
supra; McCabe v. Mazzuchelli, 13 Wis. 478; State v. Brunst, 26
Wis. 412, 7 Am. Rep. 84; State v. Cunningham, 88 Wis. 83, 57
N. W. 1119, 59 N. W. 503, and Warner v. People, 2 Denio (N. Y.)
272, 43 Am. Dec. 740, present unconstitutional attempts to with-
draw from constitutional officers portions of their powers and to
confer the same on others. It will thus be observed that the courts
have indicated a reasonably close discrimination in recognizing

as a newly created local officer one who exercised any duties which at the time of the constitution were performed by local officers, and, while it may be that some functions were at the time of the constitution imposed upon then existing town, city or county officers, which were so entirely incidental and casual and so without relation to the characteristics of their respectve offices, or, indeed, of local government at all, that, when the legislature might deem it best to relieve such officers of such incidental duties and confer them upon one specially created to exercise them, the latter's office may with propriety be held to be newly created, yet the line of demarcation between such a situation and that condemned by the various authorities has not as yet been drawn, and will require much nicety of discrimination in its location."

In the light of the foregoing rule, we ask, can it be said that the duties of sheriffs, with reference to the enforcement of the criminal statutes of the state at the time of the adoption of our constitution, were merely incidental and casual, and without relation to the characteristics of their respective offices? If so, it is possible that the legislative assembly could take away such duties and confer them upon an officer to be appointed by central authority. We think it clear that these duties were not merely incidental to such office, but, on the contrary, they have from time immemorial been inseparably connected with, and in fact have constituted, the paramount functions of such office. The Wisconsin court, in the recent decision above cited, after quoting from the Draper case in 15 N. Y., and citing the later New York decisions, further says: "We can see no reason to disagree with the views thus expressed, at least as to such functions as are obviously not essential to the existence of counties, cities, villages and towns, or to their efficiency to accomplish those purposes for which the constitution employs them, or such powers as are not essentially characteristic of specific local officers named in the constitution and by it required to exist and persist." The court then goes on to show that at the time the constitution of Wisconsin was adopted the function of drawing jurors did not belong to any particular county officer, and was merely incidental to the duties of certain county officers, and it reaches the conclusion that for this reason the legislature is at liberty to impose the duty upon newly created officers to be appointed by the circuit judges. We think the opinion fully sustains the respondent's contention in the case at bar.

A somewhat analogous question was before the Supreme Court of Mississippi in Fant v. Gibbs, 54 Miss. 396. Thirteen district attorneys had been elected in as many judicial districts of the state, and subsequently the judicial districts were reduced to 11, and the legislature sought to confer upon the governor the power to assign the district attorneys to the respective districts. There being but eleven districts, it was provided that the governor should assign to each judicial district one of the several district attorneys theretofore elected, and in making such assignments the act provided that district attorneys shall be assigned to the respective districts in which they may reside, and that the salary of each who is not assigned by the governor shall be fixed at $100 per annum, the salary prior thereto having been $1,200 per annum. The court, in holding the law unconstitutional, among other things, said: "The proposition that the legislature cannot, directly or indirectly, remove the incumbent of an office created by the constitution during the term fixed by that instrument, needs no argument nor elucidation. If not originally self-evident, it has, by a long and unbroken series of decisions, become firmly settled. * * * But the fundamental principle which prohibits the removal by legislation of a constitutional officer during the constitutional term is that the framers of the organic law, by creating the office and specifying the term, have unmistakably indicated their will, first, that the state shall always have such an officer, and, secondly, that the duration of the term of each incumbent shall depend not on the legislative will, but on the solid basis of an ordinance that cannot be changed save by a change in the constitution itself. * * * The correctness of these views will not be questioned where only one officer of a class is prescribed by the constitution, as in the case of the governor or attorney general; nor where a fixed number is established, as is the case of the judges of this court and the supervisors of the several counties. But it is suggested that where the constitution merely directs that a suitable or competent number of a designated class of officers shall be elected or appointed, and leaves that number to be determined by the legislature, the power to establish carries with it the power to change; that, therefore, even though a fixed term is prescribed, each legislature must judge of the number needed by the state, and that the judgment of one legislature on this question cannot bind a succeeding one. * * *. It is therefore insisted that whether all the incumbents shall remain in

office during the full constitutional term for which they were chosen must depend on whether the legislature deems that the state so long requires the services of the entire number. This view we deem wholly untenable, because utterly subversive of the end intended to be accomplished by the constitutional specification of terms." The relator, Fant, was one of the district attorneys unassigned, and he applied for a writ of mandamus to compel the state auditor to issue a warrant for his salary on the basis of $100 per month. Under the act in question he was authorized to perform his duties in his district only when the district attorney who was assigned thereto was absent. The court further said, in speaking of the power of the legislature to curtail his duties: "Every inch of territory where he could do any and all duty incident by law to the office to which he was elected is taken from him, and another person, under this statute, has been designated by the governor to fill the office in that territory and do all things incident to it. That person, by the assignment of the governor, is as fully and completely district attorney of Marshall county, the place of Fant's residence, as in any other county of the district. It is as thoroughly and completely his right and duty under the statute to do any and all things pertaining to the office in Marshall county as anywhere else in the district. Unless the right, in the absence of the assigned district attorney, to perform all the duties of district attorney during the terms of the circuit court of Marshall county leaves Fant invested with all the constitutional rights, privileges and duties, within the meaning and intendment of the constitution, of the office of a district attorney, then he is not left by this act charged with the office such as the constitution means. Plainly it was his duty, under the general law, to represent the state in all prosecutions or infractions of the penal laws; to institute, prosecute and defend all civil suits in which the state or a county was interested or a party. * * * The single privilege left to him is to perform all the duties of district attorney during the term of the circuit court of Marshall county during the absence of the assigned attorney. If the assigned attorney is absent on the first day of the term, Fant may act. But if the assigned attorney is present on the second day, Fant's occupation is gone. * * * He is only district attorney contingently." The court held that the act in question amounted to an indirect ouster of Fant from his office as district attorney. "While the legislature carefully refrains

from declaring outright that he shall no longer be district attorney, it accomplishes the same result by indirection; it takes from him a district and deprives him of a right to perform functions, except in an improbable and remote contingency. * * * Certainly that reading of the constitution is wholly inadmissible which subjects the right of a constitutional officer to the enjoyment of his office and the discharge of its functions to the whim, caprice or accidents that may actuate or befall some other individual."

The foregoing language is quite applicable to the case at bar. Under the act in question, as before stated, the legislative assembly have attempted to confer upon the enforcement commissioner the power, whenever he deems it necessary, to displace the sheriff and state's attorney in the discharge of important functions or duties connected with their offices. The enforcement commissioner might find it necessary, in his opinion, to displace these officers by deputy commissioners and special sheriffs in every county of the state, not only temporarily but permanently. The constitutionality of the act must be tested by what it is possible to do under its provisions, and not what it is probable may be done. Furthermore, as before stated, a law which displaces these officers by appointive officials during a portion of the time is no less open to this constitutional objection than it would be if it provided for their permanent displacement in such manner.

In the case of People v. Keeler, 29 Hun. 175, the Supreme Court of New York, in a well-considered opinion relative to the constitutionality of a statute of that state passed in 1882 transferring to the superintendent of the Albany county penitentiary certain functions theretofore exercised by the sheriff, had this to say: "It is claimed by the respondent that the statute is a violation of article 10, section 1, of the constitution, which provides that sheriffs shall be chosen by the electors of their respective counties; and the argument of the respondent is that the statute takes from the sheriff of Albany county and gives the superintendent of the penitentiary (an officer that is not elected) powers and duties which cannot thus be taken away. On the part of the relator, as we understand, it is not disputed that a law which should take away all or practically all the powers and duties of a sheriff and should give them to some officer not elected by the people would be a violation of the constitution, even though it should permit the people to elect an officer who should have the name of

sheriff, though stripped of all power and duty. And we think this must be so. The constitution does not permit the legislature to evade its provisions by taking away the powers and duties of an officer made elective by that instrument and giving them to some appointee, leaving the people the poor privilege of electing an officer who is such only in name. On the other hand, it is admitted by the respondent that to some extent the legislature may modify and regulate the duties which sheriffs are or were to perform. Perhaps the legislature might even abolish the duties and powers or some of them, altogether, as obsolete and no longer needed. But the question here presented is not one of abolishing, but of transferring, powers and duties. It was even said on the argument that the legislature might require the punishment of convicts to be by confinement in penitentiaries instead of county jails, although the latter are, and the former are not, under the control of the sheriff. That would be a part of the punishment of crime as to which the sheriff's duties might be considered to be incidental. The question then to determine is whether the present statute is a mere regulation of the sheriff's duties and powers, permissible under the constitution, or whether it so transfers his duties and powers to an appointed officer as to infringe the meaning of that instrument." The court then considers the effect of the statute in question, and holds that it makes the Albany county penitentiary the county jail of the county and its superintendent the jailer; it takes away the power of the sheriff to appoint a jailer, and gives the superintendent the custody and control of all prisoners confined therein, as the sheriff would have had if the law had not been enacted, taking away from the sheriff the custody of all persons arrested under civil or criminal process, and transferring the same to the superintendent of the penitentiary. The only authority left to the sheriff in regard to prisoners is to direct the superintendent to convey them to and from said jail. The court then says: "The question, then, is whether the custody and control of the prisoners arrested under civil and criminal process is such a part of the sheriff's office, as it existed at and before the adoption of the constitution, that such control cannot be taken from him and given to an officer not elected by the people without a violation of that instrument. * * * It has been the duty of the sheriff to arrest and confine all persons charged with crime, and to execute the process of the higher courts; and to discharge this duty

he may summon the power of the county. A power so great, the constitution provided should be intrusted only to an officer chosen by the people, thus returning to the old principles of English law (1 Bl. Com. 339); and those who framed that instrument may well have feared to give that power over the persons of citizens to any one not chosen by them."

Applying the foregoing language to the case at bar, can it be said that the special enforcement sheriffs, who, under the act in question, are expressly clothed with "all the common law and statutory powers of sheriffs in their respective counties," may, in the enforcement of the criminal statute by this act committed to their charge, summon the power of the county to their aid? Did the framers of the constitution intend to delegate such power to officers appointed by central authority? If so, why were they so careful to provide for the election by the people of the officer who from time immemorial had been vested with such authority?

The Supreme Court of New York in the foregoing case makes use of the following very apt and significant language, which, we think, is a complete answer to some of the arguments presented by the petitioner in the case at bar: "It is not necessary to say that the legislature cannot abolish some, or perhaps all, of the duties of the sheriff. For instance, the legislature might abolish all imprisonment in civil cases, as well as in cases in tort as on contract, and such legislation would destroy a part of the present duties of the sheriff. But the question, as above remarked, is not whether the legislature can abolish, but whether it can retain, those powers and duties, and give them to an officer not elected. Upon this point the case of Warren v. People, 2 Denio (N. Y.) 272, 43 Am. Dec. 740, seems to be conclusive, and the reasoning therein is sound. It may be difficult to draw the line in regard to numerous instances which are suggested by the relator's counsel, of taking away from sheriffs certain special duties and giving them to an appointed officer, and to say, as to each, whether it would be a violation of the constitution, or only a permissible modification of the sheriff's duties. If any general rule could be laid down, it would probably be that the common-law powers and duties pertaining to the office of sheriff could not be transferred to an appointed officer, whatever might be done as to powers and duties of another character." For the general rule upon the subject the court cites People v. Albertson, 55 N. Y. 51, and People v. Ray-

mond, 37 N. Y. 428, and in applying the rule to the facts before the court it was held that, under the doctrine announced in those cases, there can be no doubt that the custody of the jail and of the prisoners confined therein is one of those powers and duties which by common law belonged to the sheriff and which continued to belong to him at the time of the adoption of the constitution. And it was distinctly held that the framers of the constitution, in declaring that the sheriff should be elected, must have intended an officer who, among other things, should possess that custody, and that if it is possible to transfer to an appointive officer such power, then other powers in like manner may be transferred to other officers, the result being that the sheriff may be deprived of every power and duty which the common law gave him. The court held that the statute in question was unconstitutional in so far as it attempted to transfer the custody of the jail and of the prisoners from the sheriff to the superintendent of the penitentiary. The decision was rendered by a united court, and we have no doubt of the soundness of the rule therein enunciated.

The Supreme Court of New York, in re Brenner, 66 App. Div. 375, 73 N. Y. Supp. 689, which decision was affirmed by the Court of Appeals of New York in 170 N. Y. 185, 63 N. E. 133, after commenting upon the prior decisions in that state upon the home-rule provisions of their constitution, said: "From these and other authorities which might be cited, it must be regarded as well settled that the purpose of the constitutional provision in question is to secure to localities the fundamental right of self-government; that it protects all official duties existing at the time of its adoption, vested in local officers, and inhibits the transference of such duties to officers not elected by the electors of the locality or appointed by local authority; that it is not the officer, but the office, the existing duties and functions, to which the protection is extended, and which cannot be transferred to an officer elected or appointed other than in the prescribed manner. Nor can this be done by any change of name or colorable change of duties. Under this construction, it becomes necessary to ascertain the duties of the office in question, and whether substantially the same duties were performed by any officer at the time of the adoption of the constitution, and the particular officer on whom the same were devolved." The court held that the act in question, which attempted to transfer functions theretofore belonging to a county officer to an officer appointed

by central authority, was unconstitutional and void as being in violation of the home-rule provisions of the constitution of that state, which are substantially the same as the provisions of the constitution of this state upon that subject.

King v. Hunter, 65 N. C. 603, 6 Am. Rep. 754, is a very instructive case. There the legislature undertook to take away a portion of the duties of sheriffs, to wit, the collection of taxes, and vest such duties in a newly created officer known as "tax collector." One ground of the decision is that the act is unconstitutional for the reason that it impairs the obligation of the contract between the people and the sheriffs. The decision can have no weight as an authority upon this point outside of the state of North Carolina, which is the only state holding that an office creates a contract; but the second ground of the decision we think clearly sound, the court holding that the act in question is liable "to the more serious objection that it breaks faith with the people, by taking from them the right to choose the officer who may go into every man's house and distrain his property, or otherwise collect the taxes. Probably there is no right of which the people are more jealous, and for the infringement of which they will hold the legislature and the courts to a more rigid accountability. If the people may be deprived of the election of this officer, and if his duties and emoluments may be transferred to an appointee of an irresponsible body, of what other similar right may they not be deprived? With as much propriety every other office in the state may be cut up, and those who have been put into the office by the people may be starved out, and irresponsible persons put in. The people have secured to themselves the selection of governor because they would have the important interests of the state committed to an agent of their own choice. With as much propriety the duties with which he has been intrusted might be transferred to others, irresponsible to the people; and so with every other officer in the state." In addition to the foregoing authorities, we call attention to People v. Bollam, 182 Ill. 528, 54 N. E. 1032; State v. Barker, 116 Iowa, 96, 89 N. W. 204, 57 L. R. A. 244, 93 Am. St. Rep. 222; State v. Arrington, 18 Nev. 412, 4 Pac. 735; Mechem on Pub. Officers, section 467: "Where a state constitution provides for the election of sheriffs and fixes the term of office, though it does not define what powers, rights and duties shall attach or belong to the office, the legislature has no power

to take from a sheriff a part of the duties and functions usually appertaining to the office, and transfer it to an officer appointed in a different manner and holding the office by a different tenure." See, also, Black's Const. Law, p. 373; Throop on Pub. Officers, page 19.

The argument of petitioner that the functions of these newly created officers are state functions and not local, and that therefore the legislature, under the police power of the state, had a constitutional right to pass the act in question, is fully answered by the foregoing authorities, and especially by Mr. Eaton in his article heretofore referred to. In 14 Harvard Law Review, p. 128, he states: "It will be noticed that many of the cases cited involved the question of the validity of the appointment of police commissioners by the governor for certain cities. It will be claimed that, even admitting the right to local self-government, police officers are doing a state duty, and therefore, being state officers and not town or city officers, the state has the right to appoint them. Therefore, it is claimed, the legislature, in authorizing the governor to appoint a board of police for a city, is not interfering with the right to local self-government. To this argument there is more than one reply. It is not denied that the legislature can appoint state police. It is claimed, however, that when it does so it must pay them with state money. * * * But, apart from this objection, there is no agreement among the authorities that police officers are state and not local officers. The following cases hold that they are state officers: People v. Draper, 15 N. Y. 344, at pages 362 and 373; Mayor, etc., of Baltimore v. Howard, 15 Md. 376; Cobb v. City of Portland, 55 Me. 381, 74 Am. Dec. 572; People v. Hurlbut, 24 Mich. 81-83, 9 Am. Rep. 103; Chicago v. Wright, 69 Ill. 326; Burch v. Hardwicke, 30 Grat. (Va.) 24, 32 Am. Rep. 640; State v. Hunter, 38 Kan. 581, 17 Pac. 177; Commonwealth v. Plaisted, 148 Mass. 375, 19 N. E. 224, 2 L. R. A. 142, 12 Am. St. Rep. 566; and lastly Kelley, Adm'r v. Cook 21 R. I. 29, 41 Atl. 571 (a case in which this point was conceded by the plaintiff and no authorities cited. It is at variance with the history of the subject in Rhode Island as has been shown in these articles, and may yet return to plague its inventors. * * *). The following cases hold that they are not state officers: Speed & Worthington v. Crawford, 3 Metc. (Ky.) 210; Allor v. Wayne County, 43 Mich. 76, 4 N. W. 492 (a thoroughly well-considered case, in which the

brief for the relator is of great interest, and contributed materially to the decision reached) ; City of Evansville v. State, 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93 ; Rathbone v. Wirth, 150 N. Y. 459, 45 N. E. 15, 34 L. R. A. 408 ; State v. Moores, 55 Neb. 480, 76 N. W. 175, 41 L. R. A. 624. * * * With such confusion and conflict of view among the authorities, it is impossible to rest the right of the legislature to interfere in local self-administration of police powers upon the ground that it is the exercise of a state power and not of a town power. * * * It will be noticed that the later cases sustain the principles sought to be brought out in these papers, and are entitled to more weight than the many cases to the contrary that are largely obiter dicta. They are also later in date, and it is confidently submitted, are the better statement of the law of today."

It will be seen from an examination of the numerous authorities that the doctrine of local self-government, as generally understood, rests upon implied restrictions found in the various constitutions, and most of the cases, as will be noticed, involve the implied rights of municipalities in this respect. Here we are dealing with express constitutional limitations upon the legislative power, and this distinction must be kept in mind. But petitioner argues that under section 217 of our constitution, being article 20, which prohibits the manufacture and sale of intoxicating liquors in this state, the legislative assembly is given express authority to enact any law looking to the enforcement of that section. This contention is based upon the following language contained in said article : "The legislative assembly shall by law prescribe regulations for the enforcement of the provisions of this article and shall thereby provide suitable penalties for the violation thereof." It seems to us a strange and wholly unwarranted construction of the foregoing language to say that the framers of the constitution intended thereby to give the legislative assembly an absolutely free hand in prescribing such regulations and penalties. We think article 20 must be construed in connection with and in the light of the other provisions of that instrument, and when thus construed it is apparent that all that was intended by the use of this language was that the legislative assembly shall prescribe such regulations, etc., not inconsistent with the other provisions of the constitution. To say that under the power to prescribe regulations the legislative assembly may create new offices in contravention of the whole scheme

of government provided for by other provisions of the constitution is, we think, doing unwarranted violence to the obvious intent of the framers of that instrument.

Entertaining the views herein expressed, we are compelled to hold the act in question unconstitutional and void. The application for the writ is accordingly denied.

MORGAN, C. J., concurs.

SPALDING, J. (dissenting.) The principles announced in the opinion of my associates in this case seem to me so at variance with those underlying the formation of society into the organization known as "the state" that I am unable to give them my assent. If I understand their opinion correctly, it holds: First, that the election of sheriffs and state's attorneys, being provided for in the constitution, none of the duties pertaining to those offices under the law, at the time the constitution was adopted, can be taken from them, and conferred upon any other officer appointed by authority of the legislature; and, second, for the reason that the constitution has provided for the election of sheriffs and state's attorneys by counties, it must be implied that the people of the state, in adopting the constitution intended to establish the principle of what is commonly known as "home rule," or local self-government, and that they thereby turned over or delegated to counties the absolute right to the control of all matters relating to the enforcement of the criminal statutes of the state, and in practical effect relinquished their right to determine how or in what manner the duties of such officers shall be performed, or whether they shall be performed at all.

The courts of several of the states with constitutional provisions on this subject practically like our own have repudiated in toto the doctrine of home rule; but in considerting this case, I shall not base my conclusions upon the reasoning of the courts of this class of states, but shall assume, though it may be a debatable question, that this principle is recognized by our constitution, and that its proper application should be protected by the courts. I, however, cannot assent to the terms and methods of its application used by my brethren. I am strongly impressed with the opinion that they have been led into error by an earnest, and from their viewpoint a laudable, desire to recognize in this new state the right of local self-government, so called, in its different coun-

ties and municipalities. After long and careful consideration of the vast array of authorities, on one phase and another of these principles, it is clear to me that they have extended this doctrine far beyond any point to which it is carried by any other court of this country, and where, if put into practical operation and effect in all the counties, it might deprive the state of the right and power to enforce the laws of its own making for the protection of life, liberty and property, as guaranteed by the constitution, and would almost completely nullify the powers of the state as an organization. I am convinced that the majority opinion overlooks or fails to give due weight to several important principles, namely: (1) The purposes and objects sought to be attained by the organization of society into the political entity and system known as "the state." (2) It fails to take into consideration the relation which the county or municipality bears to the state, and the relation which county officers hold to the county and to the state. (3) It fails to distinguish between officers whose duties are to the state, and those whose duties are to the county or municipality, and likewise between the duties which one officer owes to the state and those duties which he owes to the municipality. (4) It fails to give due weight to article 20 of the constitution. (5) It is unsupported by authorities, the principle of local self-government, where upheld by the courts, being uniformly in conflict with its application, as made by the majority opinion.

Before proceeding with a discussion of the principles applicable to the law in question, I desire to call a little more definite attention to some of its provisions than has been done in the majority opinion, and also to some contemporaneous history, serving as the inducement to the legislature to enact this statute. Section 1 of chapter 187, page 303 of the Laws of 1907, provides for the appointment of a commissioner by the governor; for his compensation and expenses etc. Section 2 prescribes his qualification, and that with the advice and under the direction of the governor, he shall have and is authorized to exercise in any part of the state certain duties. Section 3 provides for the appointment of a deputy and his powers. Section 4, for the appointment of enforcement sheriffs in such number as in the judgment of the commissioner may be necessary, giving them the powers of sheriffs in their respective counties, in the enforcement of the law against the manufacture and sale of intoxicating liquors. Sections 5, 6 and 7

have no bearing upon this matter. Section 8 requires that the enforcement commissioner, upon being satisfied that the local authorities fail to enforce the law referred to in any county, city, village or town, shall, subject to the limitations of section 2 (i. e., with the advice and under the direction of the governor), with the aid, assistance and co-operation of his deputy and one or more of the enforcement sheriffs, enforce such law. Section 9 provides that nothing in the act shall in any way relieve sheriffs or municipal officers of cities, towns or villages, or the state's attorneys of any county of the duties devolving upon them under the prohibition law. Other sections make it the duty of the governor to remove the commissioner from office whenever in the judgment of the governor he is no longer a necessity. In the latter case, the office is suspended until the governor again deems the services of a commissioner required. Courts take judicial notice of contemporaneous history which led up to and induced the enactment of a law. Rev. Codes 1905, section 7319. Bailey v. State, 163 Ind. 165, 71 N. E. 655.

The territory of Dakota was under various laws relating to the traffic in intoxicating liquors. It had both high and low license laws, and in 1887 the legislature enacted a county local option law, under which some of the counties in the present state of North Dakota voted to prohibit the traffic, and others to license it. The experience of the people with the subject evidently convinced them that this traffic was the cause of much of the poverty which existed, of a very large percentage of the crime, and was a great burden on the taxpayers of the state, as well as highly detrimental to the morals of any community tolerating the traffic. It was also deemed to be a fruitful source of corruption in politics. The voters of a large number of the various districts which elected delegates to the convention which framed the constitution of the new state in 1889 instructed their candidates to vote for constitutional prohibition of the manufacture and sale of intoxicants. Accordingly the convention framed article 20 of our constitution, which provides "No person, association or corporation shall within this state, manufacture for sale or gift, any intoxicating liquors, and no person, association or corporation shall import any of the same for sale or gift, or keep or sell or offer the same for sale, or gift, barter or trade as a beverage. The legislative assembly shall by law prescribe regulations for the enforcement of the provisions

of this article, and shall thereby provide suitable penalties for the violation thereof;" and to enable the people to vote upon this article intelligently, and independently of any other part it was submitted to a vote separately and apart from the remainder of the constitution.. No voter was required, and it was not even possible, to vote for any other provisions of the constitution, or for the constitution as a whole, either for the purpose of securing the adoption of constitutional prohibition or to insure its rejection. The first state legislature which convened obeyed the terms of article 20, and enacted a law prescribing regulations for its enforcement. While this law has generally been well enforced, in a few counties little if any effort had, up to the beginning of the year 1907, been made either to obey the law or to secure its enforcement. It was understood that public sentiment in these few counties was against the law and against its enforcement, and that the voters of such counties deliberately elected state's attorneys and sheriffs known to be opposed to its enforcement, and ofttimes those who pledged the voters that they would take no steps to secure it. It was well understood that no candidate for either of these offices in such counties who was understood to favor the enforcement of law could be elected. The conditions which existed in such counties rendered them and the state the objects of ridicule by all classes of people. The business as conducted in some such counties became the fruitful source of graft and corruption. Cities, under the guise of licensing poolrooms and other places of resort, exacted contributions from the proprietors, as dealers in intoxicating liquors, for permission to carry on the unlawful traffic. County officers were believed to be participants in the revenue derived from the exactions made of those who were permitted to treat with impunity the law and constitution of the state. These conditions and the odium attached to the state by reason of their existence, as well as the growing sentiment among the people and lawmakers that the traffic was an unnecessary evil, and in conflict with the best interests of the state, and detrimental to the welfare of its people, led the legislature of 1907 to enact the law in question, with a view to making the operation of the so-called "Prohibition Law" uniform in all parts of the state, and of securing obedience to its provisions.

My opinion on the constitutionality of the law, however, is to no considerable extent based upon its having any relation to consti-

tutional or statutory prohibition. The principles involved are far wider reaching, and of far greater moment as applied to the general subject of the powers of the state to enact and enforce police regulations applicable to the whole state, and to provide the means by way of state officers to secure the enforcement of criminal statutes, than anything applying simply to the traffic in intoxicants. However, as I shall show later in treating of article 20 of the constitution, that article in my judgment furnishes reasons, in addition to those general reasons applicable to the general police power and the sovereignty of the state, why the law attacked in this proceeding is constitutional.

The people in the formation of the state, by a compact between themselves for the purpose of protecting life, liberty and property, and the reputation of its inhabitants and of all the people within its borders, and as a guaranty to their inalienable right to pursue and obtain happiness, delegated to the legislative assembly the power to enact laws not expressly or by necessary implication prohibited by the constitution. This state was not formed by a union of pre-existing local or other governments or bodies of people. The state was made the supreme organization; counties, cities, towns and other political or municipal subdivisions are the mere creatures of the state.

The majority opinion places great stress upon the article of that eminent  attorney, Mr. Amasa M. Eaton, published in the Harvard Law Review. While I shall call further attention to them, it is sufficient to say here that he had been employed to attack a law of the state of Rhode Island authorizing the governor to appoint a commission which should have the appointment of police officers for the city of Newport, control and remove them, and to make rules and regulations to govern them, and he did so upon the ground that it was an invasion of the doctrine of home rule or local self-government, and based his contention upon the historic development of the town governments of Rhode Island and of other New England states, which is entirely unlike that of the county in this state. He contended that because the state of Rhode Island had been formed by a union of four colonies or towns which each contained and maintained all the machinery incidental to government and sovereignty in itself for many years prior to the union, and because the state conducted all its affairs until 1842 without a constitution, that each of the towns or municipalities

existing within the state now retains every element of local self-government possessed by it prior to their union into a state. The case referred to was pending in the Supreme Court of Rhode Island when most of the articles were published. It takes no mental effort to see that there was far stronger reason for the application of the doctrine as contended for by him in that state than exists in North Dakota. He made an exceedingly strong and learned presentation of his views on the subject, and while they may furnish authority for this state, as they appear to do, they were not considered as the correct exposition of the law by the highest court of his own state, which held against him on all propositions, and its opinion has become a leading authority on the subject. It is found in 22 R. I. 196, 47 Atl. 312, 50 L. R. A. 330, City of Newport v. Horton, and is followed in the later case of Horton v. Newport, 27 R. I. 283, 61 Atl. 759, 1 L. R. A. (N. S.) 512. Evidently for his own satisfaction he determined to have his views printed, but in so doing he repeatedly recognized, and his argument to a considerable extent is built upon the fact, that there is a distinction between the right to local self-government in Rhode Island and the New England states and the states of the west and south, where he concedes the doctrine has far less force than in Rhode Island. If we are to destroy the sovereignty of the state, which follows the application made by the majority in this case of the principles of home rule, we do it by making the county or municipality sovereign, and instead of one sovereignty we have many, each with a power to nullify within its own borders the laws enacted by the legislative assembly for the preservation of the inalienable rights of the people and their protection in exercising them, and there is no power provided which can prevent all manner of oppression, or admit of the state performing the functions for which it was organized. To me it is perfectly clear that the state is and must be sovereign—that is, the people as represented by the state government are and must be sovereign—and that a division of the state into hundreds of minor and petty sovereignties, which is the effect of this decision, was not contemplated in the adoption of the constitutional provisions relied upon. It cannot be that it was the intention to give to the officials of any locality the irrevocable right to say whether the laws enacted by the people of the state shall be obeyed or trampled under foot as the caprice or the personal interests of its residents may dictate. The ap-

plication of the principle made means that life, liberty and property and the other inalienable rights of the people may be placed in jeopardy in any locality at the will of the inhabitants of such locality; that the laws of the state, while in terms of uniform application, are not so in fact, but may be defied at will by any community, and that a part is greater and more potent than the whole. This is not an assertion of the principle of home rule or local self-government, but is the assertion of a principle, the application of which can only be destructive of all government by the state.

Prof. Burgess, in his work on Political Science and Comparative Constitutional Law, in speaking of the ends of the state, on page 36 of volume 1, says "First of all, the state must establish a reign of peace and of law, and it must establish a government, and vest it with sufficient power to defend the state against external attack and internal disorder. This is the first step out of barbarism, and, until it shall have been taken, every other consideration must remain in abeyance. If it be necessary that the whole power of the state be exercised by the government in order to secure this result, there should be no hesitation in authorizing or approving it. The highest duty of the state is to preserve its own healthful growth and development." How can its own healthful growth and its existence and development be preserved if the voters of a locality can at any moment set at defiance the laws of the state by an intentional election of officers, whose known purpose and design is to nullify and defy the laws constitutionally enacted by the legislative assembly, and the state retain no power to enforce its own laws? The application of the doctrine of home rule sought and made in this proceeding is but a reassertion, in a new form with local application, of the South Carolina doctrine of nullification. The majority of the people of that state, as will be remembered, in 1832 asserted the right within its borders to nullify a law of congress in terms of uniform and universal application throughout the Union. The chief executive of the nation, a man learned in the law, who had served six years as judge of the highest court of Tennessee, answered the ordinance written by Mr. Calhoun, adopted by South Carolina, and the doctrine it contained, which Mr. Calhoun preferred not to call nullification, but rather a "suspensive veto" of the laws of congress, in a proclamation which has become historic. In this proclamation he says, "The power

to annul a law of the United States is incompatible with the existence of the Union, unauthorized by its spirit, inconsistent with every principle on which it is founded, and destructive of the great objects for which it is founded." These principles may be applied with greater force to the pretended right of the county to nullify within its borders a criminal statute of the state. If the principle is conceded that the county can by electing officers whose legal duty is to prosecute criminals for violation of one criminal statute, but who willfully refuse to do so, nullify the laws of the state, it necessarily follows that all criminal laws may be violated with impunity, and that neither the individual whose rights are infringed or endangered nor the state are possessed of any remedy.

In State v. Mason, 153 Mo. 23, 54 S. W. 524, it is said: "The right to establish peace and order is an inherent attribute of government whatever its form, and is coextensive within the geographical limits thereof, touching every part of its territory. From this duty flows a corresponding power to impose upon municipalities of its own creation a police force of its own creation, and compel its support out of the municipal funds. Such is the conceded doctrine by the most learned writers upon constitutional law, and such is the concensus of judicial decision throughout the United States." "It could not be true that the legislature exercising the sovereign power of the state to legislate can create a peace board, and impose upon the city the duty of maintaining it, and yet be powerless if the city sees fit to attempt to thwart the prime purpose of its existence as such." This decision was written in 1898, and refers to the constitution of 1875, and although, when that constitution went into effect, police officers were recognized as existing officers with definite duties, and although the constitution contains provisions identical with section 173 of our own, the Missouri court held that the state could take the appointment of police officers from the city.

Mr. Black, in his work on Constitutional Law, at section 108, says: "There is in every sovereignty an inherent right and plenary power to make all such laws as are necessary to a proper preservation of public security, order, health, morality and justice. This power is called the police power. It is a fundamental power and essential to government, and is based upon the law of overruling necessity. It cannot be surrendered by the legislature, or irrevocably alienated in favor of individuals. * * * It cannot be

doubted that the origin of this power must be sought in the very purposes and framework of organized society. It antedates all laws and may be described as the assumption on which the constitution rests, for the state must have the right of self-protection, and the right to preserve its own existence in safety and prosperity, else it could neither fulfill the law of its being, nor discharge its duty to the individual. To this end it is necessarily vested with power to enact such measures as are necessary to secure its own authority and peace, and to preserve its constituent members in safety, health and morality. It is a power, as has been well said, essential to self-preservation, and exists necessarily in every well-organized community. License Cases, 5 How. (U. S.) 588, (12 L. Ed. 256); Thorpe v. R. & B. R. R., 27 Vt. 140, 62 Am. Dec. 625, Cooley Const. Lim. 572. For these reasons it appears that the nature and authority of the police power is best described by the maxim, 'Salus populi, sprema lex.' * * * It has always been held that the police power is an inalienable attribute of sovereignty, and therefore can never be curtailed or diminished; that it is present in every act of the legislature, and that no legislature can either sell or surrender it, destroy or hamper the power of its successors to make such enactments as they may deem proper in matter of public police. * * * The exercise by the state at any time of its right to legislate for the protection and good government of the community can never be construed into a violation of the prohibition in question, notwithstanding its effect may be to repeal existing charters or otherwise invade the terms of legislative engagements. Stone v. Miss., 101 U. S. 814, 25 L. Ed. 1079; Boyd v. Ala., 94 U. S. 645, 24 L. Ed. 302; Slaughterhouse Co. v. Live Stock Landing Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585." And in section 109 he says "The police power extends to the making of laws which are necessary for the preservation of the state itself, and to secure the uninterrupted discharge of its legitimate functions, and for the prevention and punishment of crime, and for the preservation of the public peace and order, and for the protection of all members of the state in the enjoyment of their just rights against fraud and oppression." And he continues in section 110: "Under the American system of government, plenary authority to make police regulations is vested in the legislatures of the different states, restricted only by the paramount authority of positive constitutional prohibitions. * * * It is vested in a subordinate and delegated man-

ner in the authorities of municipal corporations. It must be observed that there is not a distinct police power inherent in municipal corporations, other than that of the state to which they owe their existence. * * * Of course, the police power delegated to a municipal corporation is not exclusive of that retained by the state. That is, municipal police regulations must yield to the general laws of the state whenever there is a conflict between them." Yet it follows from the application of the principle of home rule made in the case at bar, that municipalities may enact and enforce ordinances and by-laws in conflict with, and which take precedence over, the laws of the state.

"Subject to the paramount power of the national government, each state, under our constitutional system, is supreme and sovereign throughout its own borders—as well within cities and villages, as with rural counties, towns and school divisions. No one of these divisions, as a rule, has any political rights or authority save that which the state concedes and recognizes. Within all parts of its jurisdiction there is both an authority and a duty on the part of every state—and also an obligation on the part of all its citizens—to take care that the enforcement of its constitution and laws are such as will most contribute to the welfare of the whole people of the state, without discriminating locally in favor of any portion of them at the cost of others, whether they reside in cities, villages or towns. For the state to neglect its duty, or to surrender such authority, would be treason to itself and disastrous to the well-being of the people." Dorman B. Eaton, Government of Municipalities.

The preservation of the peace has always been regarded both in England and America as one of the most important prerogatives of the state. It is not the peace of the city or county, but the peace of the king or state, that is violated by crimes and disorders. The prosecution is on behalf of the state. People v. Hurlbut, 24 Mich. 44, 9 Am. Rep. 103.

Cooley defines a state as a body politic, or a society of men united together for the purpose of promoting their mutual safety and advantage by the joint efforts of their combined strength. Several authorities define it as a self-sufficient body of persons united together in one community for the defense of their rights, and for other purposes. In this sense the state means the whole people united together in one body politic. Another writer defines, as

among the attributes of a state : It must be an organization of people for political ends. It must permanently occupy a fixed territory. It must possess an organized government capable of making and enforcing law within the community; and says, "A community cannot be considered a state if their government is permanently incapable of enforcing its own laws." It appears from the above definitions that, when the state ceases to be able to protect its citizenship and enforce its laws, it is no longer entitled to be considered a state. It may be answered that this is not the effect of the decision, because the attorney general may perform the functions of the state's attorney where the latter officer fails or refuses to perform his official duties as a prosecutor. But under the law as it existed when we became a state, this was no part of the official duties of the attorney general, unless requested by the governor or the legislature to act in a designated case; and to adopt the theory of the respondent in this case, any change in the law adding this duty to those of that office when the constitution was adopted takes away from the state's attorneys duties which are theirs under the constitution, and is therefore invalid.

It is again answered that the remedy lies in the removal of officers who fail to perform their sworn duties. This answer is clearly weak. With public sentiment against the enforcement of criminal law in a county, so no officer can be elected who will enforce the law, but only such as are known to oppose its enforcement, how can a jury be obtained or proceedings maintained to punish an officer for failing to do things which he pledged the people he would refrain from doing, and who in case of removal would appoint others like him? And again, if the officer have a sacred inheritance in the duties incumbent upon the office when the state was organized and the people of the county the sole right to name him, no power of removal can exist except on the part of the very people who elected him. It cannot be asserted that in practical operation there is any method of removal except by failure to re-elect on the expiration of the term of office. What is a county, and what is its relation in the enforcement of state laws, to the state as a whole? Prof. Fairlie, in his work on Local Government in Counties, Towns and Villages, says "A county is one of the civil divisions of the state or territory for judicial and political purposes, and at the same time a district of quasi corporate character for purposes of local civil administration. By constitution or statute,

counties are usually created bodies politic or corporate. This has been said to mean that they have both political and business functions, and the two terms at least mark an important legal distinction in their powers and duties. As corporations their powers are limited, and less than those of a full municipal corporation. They may bring suits, and be sued, and make contracts for authorized purposes, and they may acquire and hold real estate and personal property, but these powers are for the most part incidental and secondary to the governmental functions of counties. The latter are so prominent that it has been said in a judicial opinion that counties exist only for the purposes of the general political government of the state. They are the agents and instrumentalities the state uses to perform its functions. All the powers with which they are intrusted are the powers of the state, and the duties imposed on them are the duties of the state, and the county organization is created almost exclusively with a view to the policy of the state at large." See Madden v. Lancaster County, 65 Fed. 188, 12 C. C. A. 566; State v. Downs, 60 Kan. 788, 57 Pac. 962; 11 Cyc. page 341, note 5.

For the distinction between counties and full municipal corporations, see 7 Am. & Eng. Enc. Law, p. 903, and cases cited in note 2. In Alabama this distinction has been very clearly drawn. It is said in Askew v. Hale County, 54 Ala. 641, 25 Am. Rep. 730: "It is created mainly for the interest, advantage and conveniece of the people residing within its territorial boundaries, and the better to enable the government to extend the protection to which they are entitled, and the more beneficently to exercise over them its powers. All the powers with which the county is entrusted are the powers of the state, and all the duties with which they are charged are the duties of the state. If these were not committed to the county, they must be conferred upon some other governmental agency. The character of these powers, so far as counties in this state are concerned, are all for the purposes of civil and political organization. The levy and collection of taxes, the care of the poor, the supervision and control of roads, bridges, ferries. the compensation of jurors attending the state courts, and the supervision of convicts sentenced to hard labor as punishment for many violations of the criminal law, it is the general policy of the state to intrust to the several counties, and are all but parts of the power and duty of the state. These powers can be withdrawn

by the state, in the exercise of its sovereign will, and other instrumentalities or agencies established and clothed with them." Also see Town of Montpelier et al. v. Town of East Montpelier, 29 Vt. 12, 67 Am. Dec. 748.

Black's Constitutional Law, section 132, defining a municipal corporation, says: "Municipal corporations are the administrative agencies established for the local government of towns, cities and counties, or other particular districts. The special powers conferred on them are not vested rights as against the state, nor are they in the nature of contracts, but, being wholly political, they exist only during the will of the legislature. Such powers may at any time be changed, modified, repealed or destroyed by the legislature, saving only the vested rights of the individuals." See, also, Hare's Constitutional Law, section 628.

County officers are but the instrumentalities or agencies through whom the county exercises its functions, both those pertaining to itself as a quasi municipal corporation, and those which it exercises as the agent of the state in the conduct of political affairs and in the execution of state laws. For this reason county officers can have no greater rights in the duties of their respective offices than has the county in the performance of its functions as an instrumentality or agent of the state.

In Board of Commissioners v. Board of Commissioners, 92 U. S. 307, 23 L. Ed. 552, Mr. Justice Clifford says: "Public duties are required of counties, as well as of towns, as a part of the machinery of the state, and in order that they may be able to perform these duties they are vested with certain corporate powers, and their functions are of a wholly public nature, and they are at all times as much subject to the will of the legislature as incorporated towns." And again: "Such corporations are the mere creatures of the legislative will.  *  *  *  These officers are nothing more than the local agents of the state; their powers may be revoked and enlarged, and their acts may be set aside or confirmed at the pleasure of the paramount authority, so long as private rights are not thereby violated." Fairlie, at page 106, describes a sheriff as a county officer representing the executive power of the state within his county, as the chief conservator of the peace, and as considered in law the agent of the state government, and not as a local officer. He says that as the conservator of the peace in his county the sheriff is the representative of the sovereign power of the state

for that purpose.    See Fairlie, Local Government, pp. 106-112, and cases cited; Coke (Lit.) 168 (a) ; Murfree on Sheriffs, section 1160.

A sheriff is a public officer, a mere creature of law created by the sovereign power of the state for public purposes connected with the execution of the law and the administration of justice, as the agent of the body politic, to give effect to its sovereignty and carry into effect its will.   His office is a mere civil institution, established for public political purposes, and may be regulated or changed by society.   The mere ceature of the law, he holds not by contract, and his duties change with the law.   He is the mere agent of the public, under a naked authority to perform duties prescribed to him by law, the expression of the public will for the public benefit, and all that can be claimed to be granted to him is the mere authority to be such agent.   State v. Dews, R. M. Charit. (Ga.) 397.

The prosecuting, or state's attorney as he is designated in this state, is an expansion of the old English office of attorney general. He conducts suits on behalf of the   central   government.   The colonies each had an attorney general, and Connecticut in the early part of the eighteenth century established local assistants to the attorney general, and from this beginning   the   present   system of public prosecuting officers has been established.   Their most important duties are connected with criminal prosecutions, which are brought in the name of the state, and the prosecuting attorney in such cases is acting as the agent of the state, and not as a local officer.   Fairlie, Local Government, p. 104; 23 Am. & Eng. Enc. Law, 275.

From these definitions, I think it may safely be inferred that, in considering the right of the state to modify or change the duties of the sheriff and prosecuting officer, they are to be regarded as the representatives of the state, and it is clear that they are not in this respect local officers, and such duties do not pertain to local self-administration of communities.   Regarding   the   modification or change in their duties, which it is held by this decison are not constitutional, we may at the outset eliminate from our consideration the New York and Wisconsin cases, some of which, although duly recognizing the sovereignty of the state, appear to hold that such duties cannot be changed, for the reason that they are grounded upon the constitutional provisions adopted in New York in 1846,

and copied into the constitution of Wisconsin. This provision is quoted in the majority opinion, but I again quote it: "All county officers"—and here this term is used for identification—"whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties, or appointed by a board of supervisors or other county officers, as the legislature shall direct;" and this is followed by a similar provision as to city, town and village officers. The constitution of this state contains no corresponding provision or requirement. On the contrary, it contains an express command that the legislature "shall prescribe" the duties and compensation of all county, township and district officers. It has been contended that this should not be construed to mean that the legislature can take away from such officers any of the duties known to the office at the time the constitution was adopted. The logic of this contention is that the word "prescribe" can only mean in that connection that the legislature may add to their duties, and not take from them. To me this seems a frivolous contention. The words "shall prescribe," as used in section 173, of course mean prescribe by law; that is, by future enactment of law to fix or establish their duties. If these duties were already fixed unchangeably by the law in force at the time of the adoption of the constitution, then this is a meaningless and idle provision, and leaves the legislature powerless to prescribe them as commanded. It contemplates future action; that is, action by the legislature after the adoption of the constitution. This very principle is passed upon in Field v. Marye, 83 Va. 882, 3 S. E. 707, where a section of the constitution was construed which provided that the attorney general should receive such compensation as may be prescribed by law, and it is held that this did not mean settled beforehand, and that the attorney general's salary could be diminished during his term of office. In Shannon v. Village of Hinsdale, 180 Ill. 202, 54 N. E. 181, and Mansfield v. People, 164 Ill. 611, 45 N. E. 976, it is held that the word "prescribe" means that it "should fix," and this applies to the future. The organic law of Utah as a territory required the judges to hold court at such time and place as may be prescribed by law, and it was held to mean "by law" passed by the territorial legislature, and hence by law enacted after the enactment by congress of the organic law of that territory. And again, the office provided in the law of this state is not a county office, but is a state office provided as a means

to aid the governor in emergencies. My associates have cited and quoted from some opinions which appear on their faces to sustain their decision that these duties cannot be changed or modified. One or two of them may be construed to uphold that doctrine, but most of them on careful analysis appear to me not to do so. It may be conceded that the duties of the county officers, whose offices were established by the constitution, cannot be taken from them in a body and transferred to unconstitutional officers, because to do so would be in effect to abolish the constitutional office. I cannot take the time or space to analyze all the opinions cited by my associates, but think the same purpose will be served by showing what was really decided in a few such cases. Their opinion says "We do not deny the power of the legislature to prescribe duties for these officers, which power carries with it by implication the right to change such duties from time to time as the public welfare may demand, but we do deny its power to strip such officers, even temporarily, of a portion of their inherent functions, and transfer them to an officer appointed by central authority. This, as we view it, is a plain violation of the constitution, and is subversive of the obvious intent of its framers, to reserve to the people of each county the right, to their elected officers, to enforce the criminal laws of the state." This proposition appears to me to beg the whole question by failing to distinguish between the functions of such officers as local officers and as agents of the state or state officers, which I shall later more fully analyze, and to which the authorities relating to self government in municipal corporations most clearly apply. This opinion criticised and adopted the criticism by Mr. Eaton of People v. Draper, 15 N. Y. 532, written by Chief Justice Denio, and indicates that it has been overruled by the court of appeals of New York. In that case it was held that an act of the legislature providing for the formation of a police district embracing and combining certain territory which theretofore had had independent systems, and providing for the appointment by the central government of the state, of commissioners having the appointment of all police officers in a district, was constitutional, because the enforcement of the police power of the state was a state function, and that the law in question did not interfere with local self government, because it created a larger district than the existing district. This case has become the leading case on the subject in this country, and, while in the case cited

from (People v. Albertson) 55 N. Y., the opinion by Judge Denio is criticised, it was not overruled, and the principle he established has been recognized and accepted as the law in nearly every state in which the question has arisen, and most of the states have held that the state has supreme authority over the police of a district composed of a city without joining additional territory.

But apply the principle to the law attacked in this proceeding. The legislature of this state was providing regulations for the enforcement of the police power of the state, and it made, in effect, a district of the state for that purpose, as it related to the prohibition law, and provided for the appointment of state officers who, under the direction of the governor, who, by the constitution, is charged with the duty of seeing that the laws of the state are executed, are to serve as his aids or agents for that purpose. The principle of the statute is identical with that of the New York law and others, which have from time to time been attacked on the same ground and held valid. People v. Draper, decided and recognized in the very latest cases, wherein the courts have passed upon these principles, and notably in these of People v. Tax Commissioners, 174 N. Y. 417, 67 N. E. 69, and State v. Anson (Wis.) 112 N. W. 475, infra.

Great stress is laid upon the case of People v. Tax Commissioners, 174 N. Y. 417, 67 N. E. 69, and the opinion in this case says that the court, in upholding the New York law, regarding the taxation of franchises, placed its decision upon the ground that the function of assessing special franchises did not in its nature belong to the county, city, town, or village, but belonged to the state. So I say the function of enforcing the criminal laws of the state, the right to self preservation, is a sovereign function of the state, and never has been delegated to the county, and never can be so delegated by any far fetched implication derived from the terms of the constitution. It is only by the grossest acts of judicial legislation that any such implication can be read into or out of the terms of our constitution, or any such construction placed upon article 173.

In People v. Tax Commissioners, supra, a law enacted by the legislature of New York, which provided for the appointment by the governor of a tax commission to assess all special franchises, was attacked. That law was aimed specially at the railways, and it made such franchises real property. The function of assessors

had been performed by the constitutional officers, and this law was attacked on the ground that it deprived the constitutional officers of the duties belonging to them. The court, after a labored argument to show its loyalty to the principle of home rule, arrived at a conclusion that the provisions of the law did not violate that principle, because theretofore franchises had not been taxed. It ignored the plain principle that constitutional tax assessors were clothed with authority and duty to tax all property, and that franchises were made real property, and held that, because franchises had not heretofore been taxed, their assessment was not a duty which had devolved on other officers. The doctrine of this case applies most clearly to the law providing for the enforcement commissioner attacked in this proceeding. No prohibition law had ever been in force in Burleigh county prior to the adoption of the constitution. The service of papers and the arrest of violators of such law, and their prosecution, had never been parts of the duties of either the sheriff or state's attorney of that county; and this removes those officers in that county from the rule that the majority of this court lays down as applicable and controlling in this case. My first impression was that this could not be so, but after examining authorities I am satisfied that this principle is applicable to this proceeding, as it has been repeatedly held that, where the law relating to the dutes of officers did not apply uniformly to all counties, the validity of an enactment changing the duties of such officers might be affected by the fact as to whether such duties had been incident to the local office. It may be contended that it is not the duties relating to the enforcement of the prohibition law, but those relating to all criminal laws, that belong to those offices when the constitution was adopted, and that this is the test. The logic of this may be tested by inquiring whether, if prohibition rested in this state upon the statute, would a law repealing such statute be constitutional? Could the legislature deprive these officers of the duties imposed upon them to enforce the terms of the prohibition law by repealing such law? The mere asking of this question is its own answer.

State v. Anson (Wis.) 112 N. W. 475, is nearly parallel to the New York case. The legislature of Wisconsin transferred the duties of jury commissioner from the clerk and constitutional officer who had performed them as part of his official duties prior to the adoption of the constitution, to a commissioner appointed by

judges, and it was held that this did not infringe upon the rights of the people, or of the office of clerk, because these duties were only incidental to his office, and more particularly because prior to the enactment of the law attacked there had been no officer known as a "jury commissioner." These two cases simply illustrate as is shown by the argument of the learned judge in the New York case, to what extent courts go in upholding laws passed to meet some new emergency or condition, which, unlike the act involved in this proceeding, appear to conflict with constitutional provisions, and what refinement of construction is resorted to to sustain such laws. No such refinement is necessary in the case before us.

The opinion of my associates states, in connection with the Wisconsin case, that it is apparent that the decision would have been to the contrary had there existed prior to and at the time of the adoption of the constitution county officers charged with the performance of this function, but it is expressly stated in the Wisconsin opinion that that function had devolved upon certain county officers.

In State v. Hastings, 11 Wis. 518, the law held invalid provided for an officer whose duty it should be to audit accounts against the state, and whose concurrence was necessary in their approval, before the acts of the constitutional officer should take effect. I think this is in no sense in point. Had the law of that state provided for an officer to aid the governor in executing the laws of the state, and then provided that no acts of the governor of this nature should be valid unless concurred in by this new officer, or that no act of the sheriff or state's attorney should be valid except with the concurrence of the new officer, then there might have been a parallel. Again the court of Wisconsin based its decision somewhat upon the ground that the duties of the auditor were of a judicial nature, and that in such matters the people of the state had a right to the judgment of the officer they had selected for that purpose, rather than that of an officer otherwise named.

State v. Brunst, 26 Wis. 412, 7 Am. Rep. 84, and People v. Keeler, 29 Hun. (N. Y.) 175, are not authorities, because the decisions in these cases were expressly stated to be largely upon the ground that the act held invalid deprived the sheriff of the principal part of his duties and emoluments. Then, too, the constitutional provisions of these states heretofore referred to were in force.

z   Warner v. People, 2 Denio (N. Y.) 272, 43 Am. Dec. 740, cited in the majority opinion, holds that the legislature had not the power to divide the office of clerk of court of common pleas, and create a separate office of clerk of court, dividing the duties, for the reason that the new office was given the largest share, in point of duties and emoluments, and held that the duties taken from the old office were the substance of the office itself, and therefore not pertaining to the right to regulate the duties or emoluments of the office. That case expressly holds that the legislature may regulate or add to or diminish the duties or the fees of a constitutional office, and since its publication has become the leading authority in New York to that effect.

State v. Cunningham, 88 Wis. 81, 57 N. W. 1119, 59 N. W. 503, holds that the constitution having appropriated the proceeds of public lands to the school fund, it is beyond the power of the legislature to divert them to any other use than the support of schools, and that it cannot set them aside for a city park, or withhold the lands from sale, inasmuch as that power was intrusted to the discretion of the commissioners of public lands by the constitution.

State v. Arrington, 18 Nev. 412, 4 Pac. 735, decided that the legislature could not extend the terms of constitutional officers beyond the time for which they were elected, and the remarks contained in that opinion cited as authority for the holding of this court are clearly obiter.

McCabe et al. v. Mazzuchelli, 13 Wis. 534, simply holds that a patent to land executed by the governor and the secretary of state, instead of by a board of commissioners, established by the constitution for the sale of school and university lands, was void and not competent evidence.

In People v. Squires, 14 Cal. 13, it was held that it was competent for the legislature to enact laws transferring the duties of assessors and collectors of taxes, which were constitutional offices, to the sheriff. The court says: "We do not see that it would be at all unconstitutional to authorize every taxpayer to pay his taxes directly into the treasury. The law authorizes many acts, such as service of papers, etc., which seem appropriately to belong to the sheriff's office, to be done by parties or private persons. The law might authorize the collection of stamp duties 'by various officers named'; indeed, the whole of the license receipts, where licenses are required, we apprehend, might be made if they are not

now, receivable by other persons than tax collectors. If the legislature could do away with the tax entirely after the qualification of the sheriff, it is difficult to see why they could not change the hands that were to collect it. * * * The duties of the tax collectors are wholly undefined by the constitution, as are their services and compensation. These are left to legislative direction, and we cannot see that an act of the legislature committing this special duty of collecting this license money to particular officers selected by the board of supervisors is a clear violation of the constitution; in which event only could we declare it void."

The constitution may receive interpretation from long, constant, and uniform legislative practice, and where, as in many instances, the legislature exercises the power of appointment to office, unquestioned, this is evidence of a constitutional construction concerning the separate nature of the departmental functions, and an acquiescence by the people and the various departments in such practical interpretation. Mayor v. State, 15 Md. 376, 74 Am. Dec. 572.

Apply this principle as an aid to the construction of the enforcement commissioner law. What do we find the legislative construction of the constitution, as evidenced by similar acts, has been in this state? Our legislature has enacted laws providing for game wardens, whose duties include some of those which, prior to statehood, devolved upon sheriffs. They have provided for railway policemen, whose duties likewise infringe on those of sheriffs and police officers. A law changing the duty of executing condemned murderers from sheriffs to the wardens of the penitentiary has been enacted. The same law took the custody of such criminals from the sheriff and placed it with the warden. A state board of health has been provided; a sealer of weights and measures to perform duties which were formerly performed by sheriffs. Laws have been enacted permitting the service of process by private persons. All of these laws come within the ban of the principle of home rule, if properly applied in the majority opinion. But we may go much farther and conclude that, if the duties of the sheriff and state's attorney are as sacred as maintained —that the repeal of law creating crimes is obnoxious to the divine principle of home rule—that any change in any law which in any manner decreases the duties of this officer is equally invalid. On this subject a most instructive opinion is found in R. M.

Charlton's Report (Ga.), in the case of State v. Dews, supra. In that action an act of the legislature of that state, appointing the mayor and aldermen of Savannah commissioners of the jail of Chatham county, and transferring the duties of jailer and custodian from the sheriff, was held constitutional, and that the sheriff is entirely a ministerial officer, whose province is to execute duties prescribed by law; that these duties may be contracted or enlarged at the will of the legislature. The learned judge, who wrote the opinion, goes into the history of the office from the early English days down to date. He says: "The idea that the duties of a ministerial officer cannot be changed would involve an inversion of the order of things, and be a flagrant absurdity. It would invest him, who is a mere minister and servant, with authority to limit the power of and exercise an overmastering control over those from whom he is to receive the law. These duties are the mere creatures of law, and are in their very essence changeable by the lawmaking power. That office he still retains without any interference with the tenure upon which it was conferred upon him, and with it he retains the right to execute the duties which may from time to time be appropriated to it, nor can he be deprived of that right. Those duties which are the mere creatures of law, resulting from the legislative sense of the public interests, are not his private concern, and may be modified, increased, or diminished at the pleasure of those in whom the power of legislation resides. * * * He is entitled to the office, but it is such as the laws of the land make it, and being an institution of government created for public purposes, exercising unalienable political power for the public benefit, it may be altered or modified as the public good, the interest or happiness of the people may require. The act in question does not disturb the tenure by which he holds his office, nor interfere with his right to exercise its functions. It simply changes those functions, and diminishes his duties and powers by relieving him from the duty and power, incidental to that duty, of safekeeping prisoners confined in the jail of the county. The principle upon which the validity of the act is questioned * * * would almost annihilate the powers of ordinary legislation; for what public statute is there that may not act upon his duties?" He thus disposes of the contention that the sheriff takes his office charged with duties applying to it when the constitution went into effect, and, in doing so, he quotes with approval

Treasurer v. Taylor, 2 Bailey (S. C.) 524. "It would seem indisputable that the legislature has the right to regulate the execution of the duties which are incident to the office of sheriff, and to demand an indemnity for their faithful discharge. If it be not so, then it necessarily follows that, since the sheriff is in office under the constitution, he could be bound to perform only such duties as had been prescribed before the constitution, and all legislation since has been idle and worse than idle. No one, I presume, would contend for positions which they were sensible would lead to such consequences. * * * The current of authority then is unbroken and unvaried that a public office is not held by contract, within the sense of that term as employed in the constitution, but it is an appropriate exercise of legislative power and within legislative competency to reform the office and change and modify its duties at pleasure, unless the constitution of the state shall by express provision have fixed that duty." The constitution of North Dakota has not fixed the duties of sheriff, but on the contrary, by section 173, has expressly delegated that power to the legislature; and section 2 of the schedule expressly empowers the legislature to alter or repeal any law in force when the constitution  was  adopted. The opinion in the case cited proceeds to show that in Georgia the duties of the sheriff were governed, when the constitution was adopted, if such theory is correct, by the law relating to the duties of the same officer in England, which made him the associate of the king, chief executive and military officer of the county, vested with high judicial powers, all of which were gratuitously discharged; that such construction would be contrary to the spirit of the constitution, and would be ridiculous and absurd; and that, if this principle were to apply to the office of sheriff, it would apply with equal force to all laws, which would by the application of the principle be indelibly fixed upon us, and which could not be changed, since any change would effect the sheriff in his powers and duties, and make them different from what they were in England at the period of the adoption of the Georgia constitution; and, relating to this principle, the learned judge uses this language: "That such doctrine would mean that the framers of the constitution, with the iron hand of imbruted despotism, stamped inflexible immutability upon our institutions; have bound us to the notions of our ancestors, no matter how exploded by the sentiments of society, or inconsistent with its interests; and not merely  limited,  but

abolished, the power of the legislature, in the very effort to organize it. The proposition is too monstrous to be for a moment entertained."

While this law is attacked as an interference by the state with the right of counties to local self-government, the majority opinion is confined on that subject mostly to authorities relating to cities and towns. This is doubtless due to the fact that the books contain practically no cases showing that the doctrine has been contended for on behalf of counties, or held to apply to them, while they are very numerous as relates to cities. It may be contended that there is no distinction in the principle. For the purposes of this case, this may be conceded, although in my opinion the principle of local self-government, while possibly applicable in some respects to counties, is far less applicable to them than to cities and towns, and it is so held by the various authorities, from some of which I have quoted. A county is only a quasi municipal corporation, while a city is a full municipal corporation. The county has far less interests which may be termed private than has a city. But assuming that the law relating to police powers, and the principles of local self-government which Prof. Goodnow in his work on Municipal Home Rule says is more properly termed "local self-administration," applies alike to cities and counties, I shall discuss it without making any distinction, and the principles established by the authorites which I cite relating to the doctrine in cities apply with equal and greater force to counties.

As shown, the functions of a municipal corporation are dual or twofold. They relate not only to the conduct of the private and the local affairs of the corporation, such as the care of streets, sidewalks and waterworks, and other similar duties, and the ownership of necessary property to enable them to conduct their affairs, but they also have duties, as agents or departments of the state, for the local enforcement of law, the collection of taxes, and in many other ways. The distinction between those duties which are purely local and private, and those which devolve upon the municipality as the agent of the state, have not always been clearly made where the doctrine of local self-government has been conceded or upheld, but I find no case in any state extending the doctrine to those duties relating to its public functions as an agent or local subdivision of the state for the administration or enforcement of state laws. The failure to note this distinction, I think, is re-

sponsible for the misapplication of the principle of local self-government which it appears to me my associates have made. This distinction is noted in nearly all the authorities, though in some it has not been necessary to call attention to it. Mr. Eaton in his articles notices it, but nowhere contends that the doctrine extends further than to the administration of purely local affairs, and concedes that it does not extend to the other functions of municipal corporations. In discussing it, he says in the Harvard Law Review, vol. 14, p. 128, "It is not denied that the legislature can appoint state police," but, however, claims that if the legislature does so it must pay them with state money, and this is the distinction he makes regarding peace officers appointed by the state and those appointed by a city. Again he says, page 649, vol. 13, "Of course, the state may appoint state constables and pay them"; and again, at page 651, he expressly admits the power of the state legislature in case of necessity to create a system of state police for the prevention of crime, his only contention being that in doing so it should not abolish the municipal police.

Black, in his work on Constitutional Law, at section 134, says: "In respect to all those matters in which the people of the state generally have an interest and concern, the legislature may require and compel the municipalities to discharge duties, perform works, and, if necessary, contract debts; but in regard to matters of purely local concern which are not of importance to the state at large, and which are generally best regulated by the local authorities, the rule of local self-government requires that the municipality should be controlled only by the preference and determination of its own citizens. The double functions of municipal corporations require them to assume a share in the performance of state duties, as the legislature shall apportion the same, and also to regulate the matters which only concern the particular community. In respect to the first class of duties, the legislature has control, and it may grant, modify or abrogate municipal powers as its wisdom shall dictate. * * * While municipal corporations are subordinate agencies of the state, and as such subject to the control and legislative authority of the state, yet they are also in some respects assimilated to private corporations in respect to their rights and powers. Governmental powers granted to the municipality may be altered or revoked." And again at section 136: "Officers having to do with municipal corporations are of two sorts; those whose

functions concern the whole state or its people generally, although territorially restricted, and those whose powers relate exclusively to matters of purely local concern. Officers of the former class may be appointed or regulated by the state authorities, but the principle of local self-government requires that the choice of officers of the latter class should be left exclusively to the people of a particular community. The administration of justice, the preservation of the public peace and the like although confided to local agents, are essentially matters of public concern, while the enforcement of municipal by-laws proper, and the establishment of gasworks or waterworks, and the like, are matters which pertain to the municipality as distinguished from the state at large." This is also the doctrine announced by Judge Dillon in his work on Municipal Corporations at section 58.

Black continues: "Thus a municipal board of police is clearly an agency of the state government, and not the municipality, and therefore belongs to the first class above mentioned." This is also held in People v. Hurlburt, supra. At section 138, Mr. Black gives the particular limitations upon the power of municipal corporations to enact by-laws, and, among other things, he says, "They must not be in conflict with any provision of the constitution of the state, nor with the general statutes of the state, and must not exceed or violate the limitations imposed by the charter of the particular community." It may be pertinent to inquire, if the municipality cannot pass by-laws in conflict with the constitution or the laws of the state, can it accomplish the same result, but even more effectually, by electing officers who are pledged to permit the violation of such laws, and the state be left powerless to enforce either its own constitution or its laws?

The Supreme Court of the United States minimizes the doctrine of local self-government, and in Barnes v. District, 91 U. S. 540, 23 L. Ed. 440, says: "A municipal corporation in the exercise of all its duties, including those most strictly local and internal, is but a department of the state. The legislature may give it all the powers such a being is capable of receiving, making it a miniature state within its locality. Again, it may strip it of every power, leaving it a corporation in name only, and it may create and re-create these changes as often as it chooses, or it may itself exercise within the locality any or all the powers usually committed to a municipality. We do not regard its acts as sometimes those of

an agency of the state and at others a municipality, but that, its character and nature remaining at all times the same, 'it is great or small according as the legislature shall extend or contract its sphere of action." And again, in City of New Orleans v. New Orleans Waterworks, 142 U. S. 79, 12 Sup. Ct. 142, 35 L. Ed. 943 : "The municipality being the mere agent of the state it exists in its governmental or public character in no contract relations with its sovereign, at whose pleasure its charter may be amended, changed or revoked, without the impairment of any constitutional obligation, while with respect to its private and proprietary rights and interests it may be entitled to constitutional protection."

In Mr. Eaton's articles he refers to the case of State v. Moores, 55 Neb. 480, 76 N. W. 175, 41 L. R. A. 624, as an authority strongly supporting the principles enunciated in the majority opinion, and the opinion in Newport v. Horton, supra, refers, in connection with this case, to Nebraska as the only state still holding that police officers are not state officers, and their control and appointment a proper subject for state legislation; but in Redell v. Moores, 63 Neb. 219, 88 N. W. 243, 55 L. R. A. 740, 93 Am. St. Rep. 431, States v. Moores is overruled, and the Supreme Court of that state in overruling it used some very forceful and cogent arguments. The latter case refers to the constitutionality of a statute conferring upon the governor the power to appoint members of a board of fire and police commissioners of cities. This case upholds the power of the legislature to make these provisions, and in referring to the former opinion of the court it says: "After careful examination of the opinion, and with all due appreciation of the learning and the ability of the members of the court who concur therein, we beg to say that it does not commend itself to our judgment. It holds that the provisions of the statute placing the power to appoint members of the board of fire and police commissioners in the hands of the governor are invalid, not because they are in conflict with any express provisions of the state or federal constitutions, but because they are repugnant to the inherent right of local self-government, which it is claimed was retained by the people at the time of the adoption of the organic law. As far as individual members of society are concerned, in the nature of things there can be no such thing as an inherent right to local self-government. The right of local self-government is purely a political right, and all political rights of necessity have

their foundations in human government. For an individual to predicate an inherent right, a right inborn and inbred on a foundation of human origin, involves a contradiction of terms. So far as a city is concerned, considered in the character of an artificial being, it is the creature of the legislature. It can have no rights save those bestowed upon it by its creator. As it may have been lacking some right bestowed upon it, it is in no position to complain should the power that bestowed such right see fit to take it away; in other words, the power to create implies a power to impose upon the creatures such limitations as the creator will, to modify or even destroy what has been created. The power to create a municipal corporation which is vested in the legislature implies a power to create with such limitations as the legislature may see fit to impose, and to impose such limitations at any stage of its existence. * * * We have been taught to regard the state and federal constitutions as the sole tests by which the validity of the acts of the legislature are to be determined. If the majority opinion in that case is to stand as the settled law of the state, then in addition to such test there is another, an elusive something, elastic and uncertain as an unwritten constitution, which may be invoked to defeat the legislative will."

People v. Lynch, 51 Cal. 15, 21 Am. Rep. 677, is cited as an authority in the majority opinion. I, however, do not read it that way. It holds that the legislature cannot by special act deprive the city council or the proper local authority of a city, of all discretion in respect to local improvements, when the charter leaves such matters to the judgment and direction of the local authorities, and that the legislature is limited under the California constitution relating to assessments to preventing the abuse by municipalities of that power. The learned court discusses at great length the powers of municipalities in such matters, and limits their uncontrolled exercise of those powers clearly and emphatically to internal affairs of purely local concern, and cites with approval the opinion of Judge Campbell in People v. Detroit, 28 Mich. 228, 15 Am. Rep. 202, wherein he says: "There is a clear distinction between the functions of officers whose jurisdiction is limited territorially, considered as agents of the state and as agents of the municipality. The only confusion existing on this subject has arisen from the custom, prevalent under all free governments, so far as possible of making use of local corporate agencies whenever it can be done

profitably, not only in local government, where it is required by clear constitutional provisions, but also for the purposes of the state." This case also approves the statement of Mr. Dillon, who says: "It is important to bear in mind the distinction between the state officers—that is, officers whose duties concern the state at large and the general public, although exercised within definite territorial limits—and municipal officers, whose functions relate to that particular community." The California court in this case holds that, while the same individual may unite in himself the capacities of a state and a municipal officer, as to matters in which he acts for the state he is not a city officer, but a state officer, and that there is nothing in the nature of things which precludes an officer in his municipal capacity from being clothed with functions and being entitled to immunities with which he is not vested, and which he cannot claim as an agent of the state at large.

In Newport v. Horton, supra, the Supreme Court of Rhode Island says: "The proposition of the petitioners goes too far. It assumes that, because state control interferes at all with local control, it violates the principles of local self-government. In any system of government, towns, as well as individuals, must yield something of individual independence for the public good. The most important laws are made by the legislature, and agencies are created to enforce them. Ordinarily the state makes use of existing agencies, like town or city officials, to do this, but none the less are they the officers of the state. To say, therefore, that the state cannot assume control of these agencies in public affairs is to say that a town can nullify a state law which it does not approve by choosing officers who will not enforce it. This is not the national doctrine, and for a stronger reason it cannot be the state doctrine. Two replies to this statement can be made: First, that the state can appoint its own officers to enforce its law. To this we reply that economy and expediency at once suggest the futility of having two sets of officers whose duty it is to do the same thing, and also that we see no more infringement of the right of local self-government in appointing special state officers to execute a law than in requiring local officers to execute the same laws. It may also be said that courts should not assume that local officers will not do their duty. The court does not so assume. The legislature has evidently made the assumption by the action it has taken and assuming its power, the question of policy is one for the legis-

lature exclusively. What the petitioners really claim is local independence, rather than local self-government.

In Michigan, the doctrine of local self-government seems to have received from the courts its most emphatic endorsement, but in none of the cases reported from that state does its court of last resort hold that the principle applies to municipal corporations in relation to their public functions. The last case I find from that state marking the distinction is Davock v. Moore, 105 Mich. 120, 63 N. W. 424, 28 L. R. A. 783. It upholds an act establishing a city board of health to be appointed by the governor, and the opinion refers to the distinction between public and private functions, and says, "In the discharge of public duties, there is no right of local self-government involved," and "that the care of the public health is within the police power, and therefore within the control of the legislature," and that it concurs in the distinction made in the prior Michigan cases between local and general duties, and that as regards duties which the people in the several counties owe to the commonwealth at large they cannot be allowed discretionary authority to perform them or not as they may choose. Such an authority would be wholly inconsistent with anything like regulated or uniform government in the state, and whenever the legislature imposes the performance of public duties there is no right of local self-government involved. They have certain duties imposed upon them which are of a governmental character, and which are performed by the local corporation bodies as the agents of the state, and such duties may be enlarged or diminished at the will of the legislature.

In Attorney General v. Lowrey, et al., 131 Mich. 639, 92 N. W. 289, in speaking of quasi corporations, it uses this language: "They consist of counties, townships, school districts, highway districts, etc. They are governmental agencies, and it is, to say the least doubtful if they are in any respect anything else, or have any rights that can be called private. They perform many functions, but these are for and about the business of the state, which has imposed upon them the responsibility and expense of maintaining highways, schools, drains, and bridges," etc. And the opinion in Youngblood v. Sexton, 32 Mich. 407, 20 Am. Rep. 654, is a direct answer to the construction placed upon the early Michigan cases by the majority opinion. An act of the legislature of Michigan transferred the duties of tax collectors from city, town-

ship and village officers to the sheriff of the county. Objection was made that collectors had a constitutional right to perform all the duties that belonged to their offices when the constitution was adopted, including the collection of taxes, and the court, through Judge Cooley, says: "Admitting what these complainants insist upon, that the township and city collectors have a constitutional right to perform all the duties that belonged to their offices when the constitution was adopted, it does not follow that they were entitled to collect this tax. A constitutional right to perform the old duties cannot be extended to cover the new duties merely because they happen to be of a similar nature. This law takes from the local officers nothing. The complaint of it is that in providing for a new duty it confers it upon another officer instead of the city and township officers. In this there is nothing unusual. Sheriffs in many states are collectors of taxes, and in this state they have always in contingencies been collectors. It is true that in collecting this tax the sheriff acts upon behalf of the municipalities, but so he does in any case where the tax warrant is delivered to him; and so do the county treasurer and auditor general in collecting taxes, for they collect the local taxes, as well as those levied for state purposes. The whole tax system is something in which the state at large is concerned, and the rules by which it may be made to operate harmoniously cannot be rules so inflexible as not to yield to circumstances, when the legislature deems it essential. But there is another consideration that is conclusive on this point. This objection, like the last, is supposed to find support in People v. Hurlburt, supra. But in that case we took especial pains · to show that for some purposes the townships, villages and cities of the state could not be permitted to act independently, but were and must be subject to compulsion by the state. The case of taxes for general purposes was especially instanced, and it was said that municipalities could not be left to collect them, and they must sustain local government, whether willing to do so or not. To that extent every part of the state was concerned in the action of the other part, because disorder in one locality would derange more or less the whole system. In the previous case of People v. Mahaney, 13 Mich. 487, it had been decided that the state had power to take control of the police of the city; and this was cited with approval in People v. Hurlburt, on the express ground that the police of the state and the preservation of order in every

locality was a matter of state concern, and not of mere local interest. It requires no argument to demonstrate this; the effect upon the whole state of abrogating local government in a single township or city, and leaving everything to the unrestrained passions of bad men, would inevitably be pernicious beyond estimate. Now the law under consideration, though having revenue for one object, has the police power of the state for another. It was deemed important to adopt it as a matter of police regulation. The legislature saw fit not to leave it to localities to enforce it or not at their option, and it is a matter of reasonable inference that they refrain from doing so because the refusal of a locality to enforce it would introduce disorder into the system. Whether that was the reason or not, they had, as we think, an unquestionable right to make all such provisions as they deemed essential to preclude the possibility of the law being nullified in any quarter. If to accomplish this it were deemed essential to commit the execution of the law to county instead of municipal officers, we know of nothing to preclude it. There is certainly nothing in the previous decisions of this court that is inconsistent with this feature of the law."

In all matters of general concern there is no local right to act independently of the state, and the local authorities cannot be permitted to determine whether they are to contribute through taxation to the support of the state government or assist when called upon to suppress insurrections, or aid in the enforcement of state laws. Upon all such subjects the state may exercise compulsory authority and may enforce the performance of local duties, whether by employing local officers for that purpose, or through agents or officers of its own appointment. People v. Detroit, supra; People v. Mahaney, supra; Bay City v. State Treasurer, 23 Mich. 503; People v. Hurlburt, supra.

The Indiana court is cited as an authority in the case at bar, but in Evansville v. State, 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93, in an opinion holding that a board of metropolitan police and fire board to be appointed by the legislature for cities, which is to have the control of both departments, is unconstitutional, as a denial of the right of local self-government, the court says: "If the act related alone to the management of the police department, and the state proposed to take upon itself the burden of maintaining the department as well as its management, or if it were made

to appear that the city failed to furnish a police force, or one that was insufficient for the protection of persons and property, then a very different question would be presented. And in State v. Kolsem, 130 Ind. 434, 29 N. E. 595, 14 L. R. A. 566, that court upholds the constitutionality of an act establishing boards of metropolitan police consisting of commissioners appointed by state officers, and puts it upon the ground that, in providing for the appointment of officers connected with the constabulary of the state, there is simply the exercise of the power to provide for the selection of peace officers of the state, which does not invade the rights of local self-government.

Arnett v. State (Ind.) 80 N. E. 153, 8 L. R. A. (N. S.) 1192, expressly holds that the legislature can control the appointment of police commissioners of a city, for the reason that the maintenance of the peace, and the suppression of crime and immorality, are matters of general interest, and subject to state control, and not necessary to be submitted to the people of a locality, and states that this principle has so often been vindicated against attack that the question should now be considered at rest. To the same effect, see State ex rel. Kennedy v. Broatch, 68 Neb. 687, 94 N. W. 1016; State v. Nolan, 71 Neb. 136, 98 N. W. 657; State v. Fox, 158 Ind. 126, 63 N. E. 19, 56 L. R. A. 893; State v. Hunter, 38 Kan. 578, 17 Pac. 177; Diamond v. Cain, 21 La. Ann. 309; and Commonwealth v. Plaisted, 148 Mass. 375, 19 N. E. 224, 2 L. R. A. 142, 12 Am. St. Rep. 566—in which the courts held that the privilege of local self-government in any particular in which such privilege is not guaranteed by any provisions of the constitution is not ground for declaring an act of the legislature invalid.

In State v. Fox, supra, this language is used: "It is very clear from the tenor of the whole instrument that the constitution makers never intended that the territorial divisions recognized—that is, counties, townships and towns—should govern themseleves independently of state supervision or state supremacy, but in every matter which affects the safety, morals, health or general welfare of the people at large there is undoubtedly reserved in the state the power to supervise, control, and even coerce local officers in the discharge of public duties, and even to send its own agents into organized districts, if necessary to enforce the public right or to accomplish a public benefit. * * * The enforcement of the state's criminal and revenue laws are of equal importance to all. In

all these, the setting up of corporation lines forms no barrier to the strong arm of the state in safeguarding every public interest."

In State v. Covington, 29 Ohio St. 102, an act of the legislature was held constitutional which vested the police power and duties of cities in a board to be appointed by the governor, notwithstanding the fact that at the time of the adoption of the constitution the police of cities were elected by electors resident therein, or appointed by boards or officers elected by such electors; and it was held that matters relating to the police power do not fall within the doctrine of local self-government. Also People v. Shepard, 36 N. Y. 285; Metropolitan Board of Health v. Heister, 37 N. Y. 661.

Astor v. N. Y., 62 N. Y. 567, holds that it would be carrying the doctrine of noninterference with local affairs far beyond any reported case to hold that in no case whatever could any of the powers existing in a local officer at the time of the adoption of the constitution be taken away without violating constitutional provisions. People v. McDonald, 69 N. Y. 362, holds that commissioners appointed by the legislature to widen designated highways, were lawful officers, because the commissioners of highways already in office were continued in office, with charge of the highway after the fulfillment of the office of commissioner appointed by the legislature. Same effect, see Re Woolsey, 95 N. Y. 135.

David v. Portland Water Committee, 14 Or. 98, 12 Pac. 174, sustains an act which empowers a committee appointed by an act of the legislature to establish or purchase waterworks, and says that the subjects ordinarily classed as private affairs often become matters of public importance, and holds that when the legislature determines they are of public importance they cannot be designated as mere private affairs.

The Colorado Supreme Court, in Re Senate Bill, 12 Colo. 188, 21 Pac. 481, holds that, while there was strong reason to recognize the right of local self-government, it was a matter pertaining to the policy of proposed legislation, rather than a question of constitutional construction. See, also, State v. Smith, 44 Ohio St. 348, 7 N. E. 447, 12 N. E. 829, and State v. Williams, 68 Conn. 131, 35 Atl. 24, 421.

State v. Barker, 116 Iowa, 96, 89 N. W. 204, 57 L. R. A. 244, 93 Am. St. Rep. 222, relates to the validity of a law authorizing the appointment of trustees of the city water and supply system by the district court, and it was held that such provisions were unconsti-

tutional, because it conferred upon the court nonjudicial functions, and because it took from the city the right of local self-government; and in the opinion of the court a clear distinction is made between the dual functions of a municipal corporation.  It says: "In our form of government the legislature creates municipal corporations, defines and limits their powers, enlarges or diminishes them at will, points out the agencies which are to execute them, and possesses such general powers over them as it shall deem proper and needful for the public welfare, and as to all matters of public concern, such as the performance by the city of functions as the agent of the state, the legislature has unlimited power  *  *  * but the legislative control of municipal corporations is not without limitations"—and proceeds to show that the doctrine of local self-government is applicable to those functions of the city pertaining to the supplying of local needs and conveniences for its corporate advantage, and holds that the establishment and control of waterworks is a matter that pertains to the municipality as distinguished from the state at large, and to which the doctrine referred to applies.

The distinction between the functions of political subdivisions of the state which relate to their own duties  and  those  wherein they act as the instrumentality of the state for the enforcement of law and for the carrying out of the general policy of state government runs all through the decisions of the courts relating to the liabilities of such subdivisions, and Prof. Goodnow, in his work before referred to, lays down the rule that municipal corporations are not responsible for torts committed in exercising a part of the state power, but that they are liable when acting in the exercise of those duties which are purely municipal or private.  See chapter 7, and cases there collected and cited.  The same rule applies as to the control of property and its alienation by municipalities.  Prof. Goodnow cites the laws providing for public examiners in the states of North and South Dakota and several others, as evidence, as he puts it, that with the common sense that is characteristic of the people of this country we have, notwithstanding our supposed adhesion to the political theory of local self-government or administration, not hesitated to centralize our administrative system of subjecting our local authorities to the central administrative control whenever we have seen that uncontrolled local action has led to administrative inefficiency or inequality of financial burdens.

To those interested in the subject of municipal government, I commend Prof. Goodnow's work on Municipal Home Rule. No short excerpts from it can give an adequate comprehension of the far-reaching effect of the distinctions drawn between the functions which are termed "local" or "private" and those wherein they represent the sovereignty of the state.

The state of Vermont found the same difficulty in securing the enforcement of criminal laws in some counties which was experienced in this state, and which resulted in the statute which we are considering. In that state, state's attorneys can nolle pros. criminal proceedings; and to prevent this, and to ensure the enforcement of law, the legislature enacted a law providing for the appointment by the governor, in his discretion, of special prosecutors of criminal offenses within cities and towns where, by reason of neglect or inefficiency of local prosecuting officers, criminal laws of the state were not properly enforced, and authorizing such special prosecutors to institute prosecutions and to appear in court and control the trial and disposition of such cases, and required state's attorneys to assist in such trials. The constitution of the state contained the requirement that state's attorneys should be elected by the voters of their respective counties, identical in effect with the provisions requiring county officers to be elected in this state, but the Vermont constitution contained no requirement that the legislature prescribe their duties. A prosecution was commenced by a special prosecutor so appointed, and a petition for a writ of habeas corpus was heard by the Supreme Court, wherein it was complained that the defendant was proceeded against by a special prosecutor, and it was contended that his imprisonment was illegal, because the act authorizing such appointment was in conflict with the article of the constitution requiring the election of state's attorneys by counties, and the court held the act in question constitutional, and that the legislature had power to provide for the appointment of such officers by the governor, and by officers not elected by the people, although another phase of the law was not passed upon. In re Snell, 58 Vt. 207, 1 Atl. 566.

In Massachusetts, the legislature in 1865 enacted a law providing for state police, known as the "State Constabulary Law," which provided that the governor should appoint a state constable, who might appoint deputies who should be possessed of all the common-law and statutory powers of constables except the service

of civil process, and also the powers given the police or watchmen by the statutes of the commonwealth or the charters or the ordinances of the several cities, concurrently with such officers, and that their powers should extend throughout the commonwealth.  The act also provided that among their duties they were to obey the orders of the governor in relation to the preservation of the public peace or the execution of laws, and to see that the laws of the commonwealth were observed and enforced, and to suppress and prevent crime by the suppression of liquor shops, etc.  The constitution of Massachusetts provided for the election of sheriffs, and the governor could not appoint them; and in the case of the Commonwealth v. Certain Intoxicating Liquors, 110 Mass. 172, on this statute being attacked as unconstitutional, it was upheld as not being an invasion of the constitutional provisions relating to the position of sheriff.  It will be observed that the provisions of the Massachusetts law were nearly identical with those of the one construed in the case at bar.

The Supreme Court of South Dakota had before it in 1892 a law which authorized the attorney general in certain contingencies to appoint such reputable attorney as he should see fit, and who should be authorized to sign, verify and file such informations or papers as the state's attorney was authorized to sign, file or verify, and to perform any act that the state's attorney might lawfully do and perform.  This law was attacked, and the court says: "The contention of the defendant in error is that the legislature could not lawfully empower the attorney general to make this appointment; that it was the creation of a new office, and while the legislature might do this, it could not authorize the attorney general to do so.  This position cannot be maintained.  The office of attorney general is a constitutional office, but his duties 'shall be prescribed by law' (section 13, art. 4, Const.), and so with the state's attorney.  'The legislature shall have power to provide for state's attorneys and prescribe their duties.'  Section 24, art. 5, Const.  It is thus left with the legislature to define the duties of each of these officers.  The attorney general is in the same department of service as the state's attorney, but having a larger jurisdiction, and is in a sense a superior and supervising officer.  We have no doubt, but that it would be competent for the legislature to authorize the attorney general to appoint an assistant for himself, or an assistant or deputy state's attorney, in any county,

naming the conditions under which such appointment might be made. This would not be delegating to the attorney general the legislative power to create a new office any more than a law authorizing a sheriff or register of deeds to appoint a deputy whenever a proper discharge of his official duties requred it. It is no objection that a statutory law authorizes an appointment of a deputy to a constitutional officer, and such a law may empower such deputy to discharge official duties in his own name. Touchard v. Crow, 20 Cal. 150, 81 Am. Dec. 108; Calender v. Olcott, 1 Mich. 344; Rose v. Newman, 26 Tex. 134, 80 Am. Dec. 646. Very nearly this same question was raised and decided in Re Gilson, 34 Kan. 641, 9 Pac. 763, where a provision of their prohibitory law [of which the one under consideration is nearly a copy] was sustained." State v. Becker, 3 S. D. 29, 51 N. W. 1018.

Mr. Dorman B. Eaton, in his celebrated work on the Government of Municipalities, says: "The subject of home rule for municipalities—the question how far their residents should be allowed to control their own local affairs—is one of great importance, as to which there seems to be much confusion of thought. It is quite in harmony with our republican system, and highly desirable, that public authority should not be needlessly centralized; that it should be as directly and largely exercised by bodies and officers of local jurisdiction as is compatible with just and efficient government for the nation and states. Indeed, one of the paramount objects in the creation of cities and villages—as in the creation of towns, counties, and even of states—is to facilitate the local control of their truly local affairs. The government of each of these jurisdictions involves a common principle and policy. The problem of home rule, as we ought to clearly see at the outset, raises not only a question between cities and states, but one between the states and the nation; for the pretended right of secession was but a phase of the question both of principle and policy. We ought clearly to see at the start that if a city has the absolute right to control what it may be pleased to call its own affairs, a village, a town, and a county may have the same right. These principles are indisputable. * * * Legally considered, the claim of right, on the part of every city, town or village, to regulate its own affairs, is a mere question—to be decided by the proper courts—as to the true interpretation of the constitution and laws applicable to them. It hardly need be said that on every basis of justice and law

according to which a city or village may claim a right to home rule, a county and town may make a like claim. The state in short has a duty to govern every part of its people and territory—the city and forest equally—in the way that will be best for the whole of them. The whole of its people have rights and interests paramount to those of any portion of them. * * * Any theory of home rule incompatible with these conditions is false in principle and tends to insubordination, to internal conflicts, to disintegration, and to rebellion." Government of Municipalities, Eaton, p. 28. And on page 29 of his work he makes these pertinent suggestions: "It should be regarded as fundamental that authority for home rule is one to be conceded for improving and not for degrading local government or morality. Therefore if a city or village, by its own local vote, asks for authority to close its grog-shops, its gambling haunts, or its dens of infamy, apparently the state should grant it. But suppose they are closed under state laws, and such a vote, the expression of the most degraded city majority, asks authority to open them, and make them free to all, who will say that such a vote is good reason for granting larger power for so vile a home rule? Who can maintain a right to home rule authority for making things worse? The state has a duty to aid the most moral and patriotic of its citizens in their best endeavors. But it has morally no right to confer legal authority upon the citizens of its most degraded sections or cities, though they be in the majority, to do worse things than the vote of the whole people of the state would tolerate. Civilization would speedily decay under a state government which allowed the depraved and the partisan, merely because in majority in a city, to govern it corruptly and despotically. If the gamblers and thieves shall gain the majority in a town or city, will it be the duty of the state to repeal the laws against their crimes, or to allow those who violate them to go unpunished?

It is significant of the thoughtless facility with which false and dangerous theories of home rule have lately found acceptance that the vital distinction here pointed out—the duty of the state to confer local power for improving and not degrading local government—has not been noticed, and that unscrupulous party majorities in great cities, shouting for larger home rule for degrading and partisan ends, have been, in substance, taught that they have a right to it, irrespective of consequences, merely because such a majority demands it.

Some readers may regard these elementary statements as being such mere truisms as might have been omitted. We are sorry to be compelled to think otherwise, and to find evidence of the vicious effects of the false theories they expose—theories which have caused tens of thousands of city voters to think they have been wronged in not being allowed to have their own way in wrong-doing in city affairs. These theories have supplied partisan demagogues with specious and vicious arguments. And, besides, if we concede that a part of the state called a "city" has the right to have as many grog-shops, lottery offices and gambling haunts as its majority desires, why must we not allow that part of a city called a "ward," or a "district," the same privilege, whenever its majority demands it?

The doctrine of home rule, as often presented, is not only one tending to disintegration, insubordination and anarchy, but is one which enfeebles the state and degrades it in the estimate of the people, in the same degree that it stimulates selfishness, arrogance, and partisan domination on the part of cities. When several states made war on the Union in the name of false theories as to the right of home rule, a mayor of New York, Fernando Wood, rightly interpreted their example, when he proclaimed the right of the city of New York to be a free city. Some of the champions of unrestrained home rule for cities seem to go quite as far as that notorious mayor, when they declare that "our large cities must stand in the same relation to the national government that states do," and that it is necessary "our large cities should be free cities."

We have on one side the sovereignty of the people of the whole state, and among the elements of such sovereignty is the police power, as I have shown by citations and otherwise, existing in the very foundations of society, even before the organization of the state or constitution, a power necessary to the maintenance of the state, to its self-protection and preservation as a unit of the American nation, and as a body whose supreme duty is to protect the peace and sovereignty of its citizenship, and the good order of communities, and we have article 20 of the constitution, supra, commanding the legislature to prescribe regulations for enforcing its provisions. On the other hand we have the doctrine—announced in the majority opinion—that it is not competent for the legislature to enact laws taking from sheriffs or state's

attorneys any of the duties incident to those offices wherein they act as agents of the state, in the preservation of order, and confer them upon any officer appointed by central authority, or by any other means than by the voters of a county, even though necessary to accomplish the ends of its creation. It is and must be conceded that this doctrine rests solely upon implication; that it is not contained in the constitution in express language, and rests for this implication only upon the ground that the constitution authorizes counties to elect sheriffs and state's attorneys. Now, what is the result? That the first of these principles is fundamental cannot be denied. This being so, we have a conflict in principles, and the question for .courts to determine is, which shall prevail? It is an elementary principle of interpretation that, if two constructions of the constitution are possible, the effect of one of which is to maintain and carry out the underlying principles and purposes of the instrument and preserve and protect society, while the effect of the other would necessarily, or only might, be the destruction of organized society or the depriving of the state of the means to promote the purposes of its existence and protect itself by maintaining law and order, then the former construction should be adopted. In other words, if one construction is innocent and conforms to the purposes of the instrument, while the other has a contrary effect, then that construction should not be given effect which leads or may lead, to harmful results. Sutherland, Statutory Construction, section 238; Hoke v. Henderson, 15 N. C. 1, 25 Am. Dec. 677; People v. Terry, 108 N. Y. 1, 14 N. E. 815; State v. Hope, 100 Mo. 361, 13 S. W. 490, 8 L. R. A. 608; Bowers v. Smith, 111 Mo. 45, 20 S. W. 101, 16 L. R. A. 754, 33 Am. St. Rep. 491; Leonard v. Commonwealth, 112 Pa. 607, 4 Atl. 220.

A constitutional provision should not be so construed as to defeat its evident purpose, but rather so as to give it effective operation and suppress the mischief it was aimed at (Jarrolt v. Moberly, 103 U. S. 585, 26 L. Ed. 492), and courts will look to the history of the times and examine the state of things when the constitution was adopted to ascertain the old law, the mischief, and the remedy. 6 Am. & Eng. Enc. Law, 930, notes 3 and 4.

No court of justice can be authorized so to construe any clause of the constitution as to defeat its obvious ends when another construction equally accordant with the words and sense thereof will

enforce and protect them. Prigg v. Pennsylvania, 16 Pet. (U. S.) 612, 10 L. Ed. 1060; Legal Tender Cases, 12 Wall. (U. S.) 531, 20 L. Ed. 287. When a general provision conflicts with a special provision, the general must yield to the special. Warren v. Shuman, 5 Tex. 441; Gulf R. R. v. Rambolt, 67 Tex. 654, 4 S. W. 356. What force does section 11 of the constitution, requiring all laws of a general nature to have a uniform operation, possess, if the operation of a law general in its terms and intended to apply to all people of the state alike must, notwithstanding this, depend upon the approval of a majority in any locality before it can become operative locally? The fact that a majority in any county does not care for the protection supposed to be afforded by the constitution and the law is of no importance. If one person needs and desires such protection, he is entitled to have the fullest exercise of the sovereignty of the state in his behalf, and no implication should deprive him of this.

I have indicated the circumstances under which article 20 of the constitution was adopted. It requires that "the legislature shall prescribe regulations for the enforcement of its provisions," and from citations hereinbefore made it is clear that under such circumstances courts construe the kind and character of such regulations as being within the legitimate exercise of the judgment of the legislature; that it is the judgment of the legislature rather than courts that is to be exercised. And again, the people having voted upon this article separately from the remainder of the constitution, and having by their votes adopted it, it was given an emphasis which otherwise would not have belonged to it, and it is entitled to a liberal construction with a view to carrying out the purpose of the voters in adopting it. When one section treats specifically and solely of a matter, that section prevails in reference to that matter, over other sections in which only incidental reference is made thereto, because the legislative mind, having been in the one section directed to this matter, must be presumed to have there expressed its intention, rather than the sections where its attention was turned to other things, and the same rule applies to constitutional provisions. 26 Am. & Eng. Enc. Law, 620, and cases cited; Warren v. Shuman, supra; Gulf R. R. v. Rambolt, supra.

It is an elementary principle that when a power is conferred everything necessary to carry out the purpose of the power con-

ferred, and make it effectual and complete, will be implied, and the legislature is the sole judge of the methods necessary to the accomplishment of the objects which it seeks to attain. Studabaker v. Studabaker, 152 Ind. 89, 51 N. E. 933; Sutherland, Statutory Construction, sections 340, 341; Cooley, Const. Lim. 194; 26 Am. & Eng. Enc. Law, 614; 6 Am. & Eng. Enc. Law, 928, note 4. See Arnett v. State, supra, and cases cited. Section 68 of the constitution reads: "The legislative assembly shall pass all laws necessary to carry into effect the provisions of this constitution." The state, and the several counties within the state, had had nearly 20 years' experience, and that experience proved that the execution of these provisions could not be intrusted to the people of certain localities, or to the officers elected by them, and the judgment of the legislators devised another method, whereby an officer was appointed to co-operate with the governor of the state in maintaining the supremacy of the constitution. The question was one of policy and method, and solely within the judgment of the legislators, and, through the law in question, they expressed their judgment as to the means necessary to secure enforcement. Their judgment cannot be revised by the courts. Local option, as I have heretofore indicated, was in effect when the people voted prohibition of the liquor traffic into the constitution. They had given it a trial; it was condemned by their own votes. It has remained for this court to say that the people of this state were ignorant of what they desired to secure, and of what they were doing, and that, while they believed that they were voting out local option and voting in prohibition, they were in fact changing from legislative to constitutional local option, and that the requirements of the legislature contained in article 20 left little or nothing to the discretion of that body; that it is powerless to exercise its best judgment as to what regulations are necessary or best to comply with or enforce the provisions or commands of that article.

The logical and practical application of this decision in this proceeding means that this state not only has, in spite of the plain terms of the constitution to the contrary, local option as to the liquor traffic, but worse yet, that it lies in the option of any county, indirectly, by electing officers pledged to violate their oaths of office, to disobey any or all statutes enacted for the suppression of crime, for the promotion of public health and morality, for the protection of life and property, the assessment and collection of

taxes, and the education of children, and, in effect, to nullify at will any part or the whole police power, heretofore supposedly embedded in the very beginning of society, and older and more sacred than the constitution itself. Under it the people of any locality may defy the power of the state to preserve order, and maintain partial or total anarchy, as they may elect.

It must not be overlooked that, in construing a constitution, the courts always regard not simply what is happening, but what may or what is possible to happen. I repeat that the things above suggested are possible under an undue, and as I believe unwarranted extension of the principle of local self-government, so-called. I, however, have little fear that such conditions will ever prevail to any considerable extent. Fortunately, there will always be a majority of the people in most, and I believe in the near future in all, our counties, whose respect and reverence for law, though they may doubt the wisdom of a partcular law, will prevent the prevalence of any such conditions.

From a review of all the authorities on the subject to which I have had access, I find none holding that positive prohibition not contained in the constitution can rest solely upon implication, when the result or effect is or may be to deprive the state of its police power, and negative its ability to afford its subjects the protection which is intended to operate as among the primary functions of the state. No such doctrine should be based upon any mere implication. The statement of it means that the county is bound by no laws except those its people may choose to ratify, and that all others may be annulled or resisted locally. "Our constitution does not contain the absurdity of giving power to make laws, and another to resist them." At least such absurdity should rest upon some stronger authority than any derived merely by implication, when opposed by a positive prohibition. The enforcement of the criminal laws of the state has been universally conceded as a function of the state, and not solely included in the proper sphere of local self-government, the principle of which only applies to matters in which the people of the state at large have no interest, and I deem it beyond the province of the courts to hold that, because the constitution has permited the election of state's attorneys and sheriffs by counties, it must be implied that the exclusive right and power to say whether criminal laws shall or shall not be observed rests in each county.

From a consideration of the cases cited and many others, I am satisfied that the state has, within well-defined limits, the right to prescribe the methods and means to be used to enforce its criminal laws; that the office provided for in the law in question was a state office, with state and not local duties; that the providing for it was a political question, the determination of which was within the judgment of the legislature, and not subject to the review of courts; that it exercised its judgment as to the method best adapted to meet the emergency, and without conflict with any principles of local self-government; but that if there existed such conflict, the express command and prohibition of the constitution should prevail rather than anything which must be read into it or unnecessarily implied from it.

I therefore conclude that the law in question is not subject to the objections made, but is a proper exercise of the legislative powers and functions.

The principle of the majority opinion is very far-reaching, and by implication puts a restriction on legislative power and discretion, as well as upon the people of the state, so great that it will be found, under the practical working of the rule announced, that the lawmaking power will be seriously hampered in framing legislation to meet new situations as well as present and future conditions, and this is my apology for the great amount of space which I have used in expressing my views and the reasons which seem to me to afford them ample support.